The ERIE ENDOWMENT, Appellant,

v.

UNITED STATES of America.

No. 13992.

United States Court of Appeals
Third Circuit.

Argued Dec. 4, 1962.

Decided March 28, 1963.

**152**

Robert E. Kline, Pittsburgh, Pa. (William E. Hirt, Enoch C. Filer, Walter A. Dart, Jr., Erie, Pa., on the brief), for appellant.

Earl J. Silbert, Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Attys., Dept. of Justice, Washington, D. C., Joseph S. Ammerman, U. S. Atty., on the brief), for appellee.

Before BIGGS, Chief Judge, STALEY, Circuit Judge, and LEAHY, District Judge.

LEAHY, District Judge.

This case is the first in which an appellate court is asked to chart the outer borders of permissible accumulation of a tax-exempt organization. Plaintiff-appellant (hereafter "Erie") is a Pennsylvania non-profit corporation, incorporated on June 1, 1949, to carry out the purposes of an irrevocable *inter vivos* trust established by E. H. Mack by indenture of December 10, 1935. Mack, 77 years old when he set up the trust, originally contributed 100 shares of Class A stock of The Erie Dry Goods Co., par value $100 per share. In 1953, Erie filed its application for exemption from taxation under § 101(6) of the Tax Code (predecessor of § 501(c) (3)[1] of the present Code). Erie subsequently filed an alternative request that it be granted exemption either as a charitable organization under § 501(c) (3) of the 1954 Code or as a civic organization under § 501(c) (4).[2] Rulings were issued in 1958 holding: 1. that Erie did qualify as a charitable organization under § 501(c) (3) but that it lost its tax-exempt status because it violated the provisions of § 504(a) (1)[3] denying such exemption to "any organization * * * which * * * accumulated out of income during the taxable year or any prior taxable year * * * [amounts] unreasonable in amount or duration"; and 2. that Erie did not qualify for exemption under

§ 501(c) (4) because it was not a civic organization.

Erie paid taxes in the amount of $2,992.93 for 1958, filed a claim for refund which was denied, then brought this suit for refund. The district court concluded Erie's accumulations had been unreasonable, thereby depriving it of tax-exempt status under § 501(c) (3) and that Erie did not qualify under § 501(c) (4) for exempt status. Erie appeals.

■ 1. At the outset, we are admonished by Erie to note that statutory provisions exempting charitable organizations from taxation are not to be weighed lightly. This is true. The oft-repeated teaching of Helvering v. Bliss, 293 U.S. 144, 55 S.Ct. 17, 79 L.Ed. 246, that "exemption of income devoted to charity * * * [was a] liberalizations of the law in the taxpayer's favor * * * begotten from motives of public policy" and "not to be narrowly construed"[4] is still of relevance in considering such provisions. But more recently than its decision in Bliss, the Supreme Court suggested a caveat. In Better Business Bureau v. United States, 326 U.S. 279, 283, 66 S.Ct. 112, 90 L.Ed. 67, the Court said:

"It has been urged that a liberal construction should be applied to this exemption from taxation under the Social Security Act in favor of religious, charitable and educational institutions. Cf. Trinidad v. Sagrada Orden, 263 U.S. 578 [44 S.Ct. 204, 68 L.Ed. 458]; Helvering v. Bliss, 293 U.S. 144, 55 S.Ct. 17, 79 L.Ed. 246. But it is unnecessary to decide that issue here. Cf. Hassett v. Associated Hospital Service Corp., 125 F.2d 611 (C.C.A. 1). Even the most liberal of constructions does not mean that statutory words and phrases are to be given unusual or tortured meanings unjustified by legislative intent or that express limitations on such an exemption are to be

1. 26 U.S.C. § 501(c) (3).

2. 26 U.S.C. § 501(c) (4).

3. 26 U.S.C. § 504(a) (1).

4. 293 U.S. 144, 151, 55 S.Ct. 17, 79 L.Ed. 246.

ignored. Petitioner's contention, however, demands precisely that type of statutory treatment. Hence it cannot prevail."

Here, an express if imprecise limitation against unreasonable accumulations has been written into the law. Senator George, Chairman of the Senate Finance Committee, presenting the Conference Report to the Senate, declared that the purpose of the provision was "to force * * * charitable organizations to spend currently the money which they receive for the purposes upon which their favored tax status is based."[5] Liberal rules of statutory construction can be mildly useful, but hardly dispositive of the concrete legal-factual problem to be decided in every case such as the present —viz., *is this charitable organization unreasonably accumulating income?* For Erie is a charitable *corporation*, and thus as much a fusing of legal imagination and legislative grace as any other corporation. It has no natural right to tax exemption, but rather a Congressional balm granted because losses in tax revenues were deemed compensated for by the value of its charitable work.[6] Absent a sufficient amount of charitable work commensurate with the total amount of Erie's available charitable funds, exempt status must cease or, in fact, never come into existence.

2. But for the alleged unreasonable accumulation, neither the Commissioner nor the district court questions the designation of Erie as a charitable organization. Trust income is to be spent

" * * * for the advancement of the Christian religion, for the promotion of science and the arts, and the education, welfare and social development and betterment, both materially and spiritually of the people, more especially of, but not restricted to, the City and County of Erie, Pennsylvania, regardless of race, sex, color or creed."

No specific program for the disposition of trust funds was provided for by Mack, nor were such amounts as were accumulated saved for any specified purpose or purposes.

The relevant section of the trust ["Accumulation Section"] provides:

"The Trustees hereof shall pay, apply, divide and distribute the net amount of said incomes, revenues and profits each calendar year as follows, to wit:

"Ninety (90%) per cent of said net amount shall be retained during the first five (5) years; eighty (80%) per cent of said net amount shall be retained the second five (5) years; seventy (70%) per cent of the said net amount shall be retained during the succeeding ten (10) years, and fifty (50%) per cent of said net amount shall be retained the succeeding ten (10) years; not less than ten (10%) per cent of said net amount shall be retained thereafter by said Trustees and added to the corpus of this trust as a part thereof for the purpose of increasing the principal of the trust estate until the total aggregate of such additions with the corpus of the trust shall be as much as Ten Million Dollars."

Two paragraphs then follow, stating the grantor's wishes with respect to "the said certain amount not retained as aforesaid for addition to the corpus of this trust."[7] The final paragraph of this

---

5. 96 Cong.Rec. p. 15516. Erie's argument that the predecessor provision to § 504 was adopted "unintentionally" thus requires no further discussion, particularly since § 504 re-adopted four years later essentially the same provision as was adopted in the 1950 Code.

6. See H.R.Rep. # 1860, 75th Cong.3d Sess. 19, 20; Sico Foundation v. United States (1961) Ct.Cl., 295 F.2d 925, 930, n. 19.

7. "Forty (40%) per cent of the said certain amount not retained as aforesaid for addition to the corpus of this trust, and subject to the discretion heretofore granted my trustees, shall be paid, applied and distributed by my Trustees for the advancement of the Christian religion."

"Sixty (60%) per cent of the said certain amount not retained as aforesaid for addition to the corpus of this trust

section of the trust [8] states that when the income of the trust fund amounts to $100,000 the limitations stated in the preceding two paragraphs [9] may be "entirely disregarded" by the trustees.

The district court determined that Erie's income from 1936 to 1958 was $504,200.94; its contributions totalled $114,669.20; and it accumulated $389,-531.64. From Erie's incorporation in 1949 to the end of 1958, net income was $314,494.98, charitable contributions were $93,314.20, and accumulations total-led $221,180.78. In all these years since 1936, the mandatory accumulation provisions were followed by the trustees,[10] and so restricted amounts available for distribution that Erie's contributions perforce were primarily made to other charitable organizations, rather than to independent Erie-sponsored projects.[11] By 1958, the calendar year in dispute, the trustees were required to retain 50% of income. In 1958, Erie's net income was $26,537.89. It contributed a total of $34,000 [12] and left, at the end of the year,

and subject to the discretion heretofore vested in my trustees, shall be paid, applied and distributed to or for the other purposes of the trust as hereinbefore stated, by making distributions as the trustees may decide, directly or by aiding and contributing to the support of suitable agencies, or for the establishment and/or management of proper agencies, in such amounts and for such purposes as may be selected and determined as respects each year by said Trustees in their uncontrolled discretion."

8. "When the income of this trust fund amounts to One hundred thousand ($100,-000.00) Dollars, the percentages allotted for the foregoing purposes shall be entirely disregarded and the proportion to be allocated for religious and other purposes shall be entirely in the uncontrolled discretion of my trustees. Appropriate proportions shall be allotted at all times to religious purposes."

9. That this final paragraph of the disputed section of the trust applies only to the preceding two paragraphs is clear from a reading of the three paragraphs. The first paragraph of the three (n. 7, supra) concerns money to be spent for religious purposes; the second (n. 7, supra) concerns money to be spent for "other purposes"; the third (n. 8, supra) states "the proportions * * * allocated for religious and other purposes" shall be disregarded when the income of the trust equals $100,000. The accumulation provision speaks specifically neither of religious nor any other purposes, but only of *how much* is to be accumulated in what period of time.

10. In 1956 and 1957, for example, Erie accumulated 50% and for the ten preceding years, 70%. See Accumulation Section, supra.

11. Enoch C. Filer, counsel for Mack and Erie, and a trustee of Erie since its establishment, testified as follows:
"During the period of Erie Endowment's existence, was it ever actively engaged in a charitable project on its own undertaking, as opposed to contributing money to other charities? Did it ever initiate and actually operate any charitable program?
"A. No, I don't think it ever operated any charitable program, and I can't recall that it ever initiated. Perhaps it did. I don't know. I don't remember.
"Q. Its activity was solely confined to contributing moneys to other charities?
"A. That is within twenty-six years. And I certainly can't remember, during the last twenty-six years, whether there might have been an occasion.
"Q. But if it was, it would only be on occasion. Certainly the primary operation of The Erie Endowment was contributing moneys to other charities.
"A. That is because the amount we could contribute was limited. * * * very limited, because of the mandatory provisions for accumulation, so the best way we could serve during this period has been to give to charitable organizations, or welfare organizations."

12. Filer's testimony indicates that the 1958 expenditure of more than current income was prompted by the fact that in a previous year Erie had taken "a substantial capital gain". Erie was, however, operating on the 50% accumulation basis.
"Mr. Filer:
"The mandatory accumulations were $13,268.95 and the distributable income was $13,268.94.
By the Court:
"Q. On a basis of fifty per cent that that year?

a total of $389,531.64 of accumulated income.

■ 3. Exemption under § 501(c)(3) is to be denied to charitable organizations which accumulate sums "out of income during the taxable year or any prior taxable year and not actually paid out by the end of the taxable year—[which] (1) are unreasonable in amount or duration * * *." 26 U.S.C. § 504(a). "Reasonableness," that hobgoblin of judicial minds, can only be divined on the basis of all relevant facts. The standard to be applied is whether the taxpayer can justify the total accumulation of income at the end of the taxable year, in terms of both time and amount, on the basis of a rational total program of charitable intent. The plan must be viewed in its entirety. An eight year plan of accumulation to provide a medical research center for a university costing $500,000 may be reasonable;[13] so may a ten year period of accumulation to build up sufficient funds to pay retirement benefits to employees where that is the sole purpose of the foundation;[14] so may accumulation for the purpose of obtaining sufficient funds to construct and maintain a civic building where the charitable organization was formed for that specific purpose.[15]

Absent a justifiable total program of accumulation, however, tax exemption must be denied. The program must be prospective and not occur to the organization only after the Commissioner's shadow becomes visible. "Afterthoughts will not suffice." [16]

■ 4. Upon examination of all the evidence offered, we find Mack had no specific projects for which the accumulations were to be kept, and the trustees of Erie took no action to prepare a program of expenditures of the accumulated income.[17] No evidence has been presented indicating any rationale behind the 90%, 80%, 70%, etc. accumulation except Mack's desire to do something "very substantial." [18] In addition, the total amount of $10,000,000 before accumulations cease, appears patently unreasonable in the light of Mack's original contribution of stock worth $100,000 and the worth of the Endowment 25 years after its establishment of slightly over $1,000,000—or, at most, $3,000,000 if Mack's testamentary bequest of approximately $2,000,000, not yet received by Erie, is counted. By no standard of reasonableness can this charitable organization's total accumulation at the end of 1958 of over $389,000 of net income, over $200,000 of which was retained after enactment in 1950 of § 3814, predecessor to § 504, be sustained.[19] We, here, find the accumulation unreasonable both as to

"A. That is right.

"Q. You were down there to the fifty per cent basis?

"A. We will be there until 1965. We distributed, however, all of that—we distributed a total that year of $34,200.00 because we had had some money set aside that we had for previous years—we had a capital gain, I believe, that year. * * *"

13. Samuel Friedland Foundation v. United States, D.C.N.J., 144 F.Supp. 74.

14. Truscott v. United States, D.C.E.D.Pa., 1958, 1 Am.Fed. Tax R.2d 1743.

15. Hulman Foundation v. United States, D.C.S.D.Ind., 1962, 217 F.Supp. 423.

16. Stevens Bros. Foundation v. Commissioner of Int. Rev., 39 T.C., No. 11, CCH Tax Court Reporter Current Regulations, Decision # 25,708, p. 3079.

17. "*By the court:* * * * [I]n the Friedland case, [n. 13, supra] the judge there talked about the program. He said in view of the nature of the program that the trustees had in mind, a $500,000 deal over a period of so many years, it seemed reasonable to accumulate so much.

"Q. But you had no such program.

"A. Not definitely like that. Not for any particular objective, no we did not.

"Q. During 1958?

"A. No. For these general programs which we had in mind, of carrying out the objectives of the donor of the trust."

18. Filer testimony, p. 36a.

19. The factual situation here is comparable to that in Stevens Bros. Foundation v. C. I. R., supra, in which Judge Train,

amount and time,[20] and hold that Erie was properly deprived of tax-exempt status pursuant to § 504 of the Tax Code.

    5.  Section 501(c) (4) authorizes tax-exempt status for:

"Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare  \*  \*  \* and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes."

Erie claims it is entitled to exemption under this section; the district court found Erie failed the tests [21] which would allow it to be so categorized. We agree with the district court.

■  In United States v. Pickwick Electric Membership Corp., 6 Cir., 1946, 158 F.2d 272, a civic organization was described as embodying "the ideas of citizens of a community cooperating to promote the common good and general welfare of the community." [22] In C. I. R. v. Lake Forest, Inc., 4 Cir., 1962, 305 F.2d 814, the court spoke of a civic organization as being *a movement of citizenry or the community.* [23] We align ourselves with these decisions (we find

none to the contrary) and hold that whatever other difficulties are posed in defining "civic organization" [24] the organization must be a community movement designed to accomplish community ends.

■  The Erie Endowment is essentially a beneficent creation of one man, E. H. Mack. No group of citizens joined with him in setting up the Endowment; none have joined in contributions. Prior to incorporation, loans were made of over $100,000 of Erie money to Mack, Mack's daughter, and to the New Castle Dry Goods Company, in which Mack had a substantial interest. No loans were ever made to other persons or corporations.[25] After incorporation, Mack continued to exert influence on Erie's policies. Corporate minutes reflect that the 1951 decision itself to limit Erie's contributions to recipients within Erie County, Pennsylvania, immediately followed an "emphatic" statement by Mack to that effect. Indeed, as late as 1960, corporate money was contributed only with the understanding that a plaque was to be erected memorializing Mack and his interest in the receiving organization. In short, E. H. Mack's contribution to Erie County consisted of a charitable

---

in holding the accumulation of Stevens unreasonable, stated the facts as follows:
    "Here petitioner has been in existence fifteen years (as of the end of the last taxable year before the Court). No functional objective appears from the record. We are not told when the $1,000,000 asset goal testified to by petitioner's president was determined. In recent years petitioner has embarked on a student loan program, but no substantial effort is made to relate the needs of that program to the $1,000,000 goal. Neither petitioner's charter, by-laws, nor the minutes of the meetings of its members or officers, nor any other part of the record indicates any particular use to which either the accumulated income or the then current income would be put." [p. 3077]

20.  The United States concedes that § 3814 of the 1950 Code [504] only operates prospectively to deny tax-exempt status, but correctly notes that both statute and regulations indicate accumulations in the taxable year *and preceding years* must

be considered in a determination of "reasonableness". See, Treasury Regulations on Income Tax (1954 Code, § '1–504–1 [b]).

2f.  We assume, *arguendo*, as did the district court that if Erie can meet the specific tests for a civic organization, it can be tax-exempt under § 501(c) (4) even if it had unreasonably accumulated income.

22.  158 F.2d 272, 276.

23.  305 F.2d 814, 818.

24.  See, generally, the valuable discussion of "charitable organizations" in C. I. R. v. Lake Forest, Inc., supra.

25.  Erie's claim that as incorporation occurred in 1949, loans made prior to that date are irrelevant is incorrect. A study of pre-incorporation activities of Erie is surely meet for this Court in determining present status, particularly as Erie was established to carry out the purposes of Mack's private trust.

organization, but not a civic organization. Too many uncut and uncuttable ties to Mack have existed throughout the history of Erie to allow legal separation of one from another sufficiently to allow Erie tax exemption as a civic organization.

The decision of the district court will be affirmed.