PEOPLE'S EDUCATIONAL CAMP SOCIETY, INC., Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 63, Docket 28264.

United States Court of Appeals Second Circuit.

Argued Dec. 10, 1963.

Decided April 24, 1964.

I. Herman Sher, New York City, for petitioner.

Louis F. Oberdorfer, Asst. Atty. Gen., John B. Jones, Jr., Meyer Rothwacks, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before WATERMAN,* SMITH and HAYS, Circuit Judges.

WATERMAN, Circuit Judge.

This is a petition to review a decision of the Tax Court of the United States which upheld the Commissioner of Internal Revenue's determination of a de-ficiency of $25,784.43 in the federal income tax of petitioner, People's Educational Camp Society, Inc., for its fiscal year ending September 30, 1956. The Tax Court rejected petitioner's claim that it was exempt from the income tax under Section 501(c) (4) of the Internal Revenue Code of 1954 as a nonprofit civic organization operated exclusively for the promotion of social welfare, rejecting it on the ground that such an exemption was precluded because of the relationship which petitioner's operation of a large commercial resort bore to its totality of activities. We agree that petitioner was not entitled to the exemption.

A complete statement of the facts surrounding petitioner's operations, including a detailed breakdown of its financial activities, can be found in the opinion of the Tax Court, reported at 39 T.C. 756. Our summary thereof follows:

Petitioner is a New York membership corporation with its principal offices in New York City. It was organized in 1920 by persons associated with the Rand School of Social Science, an institution then operated by the American Socialist Society and engaged in conducting adult classes and presenting lectures and programs related to the dissemination of information on the labor movement and socialist principles. During 1920 officials and friends of the Rand School became interested in purchasing a tract of 2,196 acres of land in the Pocono Mountains of Pennsylvania, with an eye toward developing on the tract a campsite where the Rand School's faculty, students and friends might gather during the summers to carry on their studies and develop programs in which they were interested. After the school's executive secretary had acquired an option to purchase the land for about $21,000, petitioner was organized to take title to the property and develop the summer camp, which was eventually given the name "Tamiment," the name of a lake nearby.

---

* This appeal was argued before a panel composed of Judges Clark, Smith and Hays. Judge Clark died before any opinion had been prepared, and thereafter Judge Waterman was substituted. Judge Clark had voted in a memorandum to affirm.

Petitioner, organized as a New York membership corporation, has never issued any shares of stock and has never had any stockholders. Its operations are conducted by a group of individuals known as members, whose number may never exceed 35 and whose election to membership is governed by petitioner's by-laws. Any person may be elected to membership who has publicly endorsed the principles of socialism for at least two years, and whose membership has been recommended by petitioner's Board of Directors and has been approved by those persons already members. None of petitioner's officers or directors receive any salary or other compensation, but the managing director and associate director, who conduct petitioner's day-to-day operations, do receive salaries as do petitioner's other employees.

When petitioner was organized its certificate of incorporation set forth its objects in the following terms:

"To organize, conduct and maintain summer camps and centers for instructive and recreative purposes; to build, purchase, own, lease, manage and operate camps, dormitories, dining halls, recreation rooms, playgrounds, reading rooms, halls and other buildings for the purpose of said corporation as herein set forth; to diffuse a general knowledge of literature, art and science through the medium of lectures, publications and dramatic performances; to borrow money for the corporate purposes of the corporation and to issue bonds, notes or other evidences of indebtedness therefor; to assist other educational, civic, political and economic movements and organiza-

tions; to cooperate with such organizations and movements and to initiate such movements, but said purposes shall not extend to those objects for which corporations may be formed pursuant to the Education Law, nor shall any activities of the said corporation be conducted for pecuniary profit to its members." [1]

As of the time of the Tax Court proceedings below, petitioner's by-laws provided that upon dissolution all its property was to revert to the American Socialist Society, although that Society, along with its Rand School of Social Science, had ceased to exist in 1956. As of this time no steps had been taken to amend the portion of the by-laws relating to the disposition of petitioner's property upon dissolution, nor had any alternative plan for dissolution been contemplated.[2]

From the opening of Camp Tamiment for occupancy in July of 1921, it began to experience considerable growth. During its first twenty years its growth was steady though moderate. By 1941 the camp's annual gross income had increased to $281,633.87, and the value of its fixed assets had increased to $398,-663.93. Except for the years 1925 and 1932, when small losses were incurred, Tamiment has each year consistently shown a profit, and, except for the period from 1921 to 1923 when petitioner received contributions, it has been entirely self-sustaining. In January of 1936, and again in January of 1939, petitioner obtained rulings from the Commissioner of Internal Revenue that, on the basis of facts then available, petitioner was entitled to an exemption under the then existing provisions of the tax laws, provisions which later came to be embodied in

1. The limitation relating to the Education Law was inserted at the direction of the Secretary of State of New York to make it clear that petitioner had no power or authority to operate a school.

2. No claim is made that, because of the demise of the American Socialist Society and the failure of petitioner thereafter to revise its by-laws relating to the disposition of its property upon dissolution, petitioner fails to qualify for a Section

501(c) (4) exemption on the ground that some of its property might eventually inure to the benefit of private persons. Petitioner claims, and the Government does not deny, that, as petitioner's by-laws stand, its assets upon dissolution would have to be distributed in accordance with the doctrine of *cy pres*. See Sherman v. Richmond Hose Co. No. 2, 186 App.Div. 417, 175 N.Y.S. 8 (4th Dep't 1919).

substantially the same form in Section 501(c) (4) of the 1954 Code.

Tamiment's operations from 1941 through the taxable year 1956 represented a second distinct phase of its development, one marked by a growth much more rapid and substantial than that previously experienced. This was manifested by considerable increases in operating expenses and in the value of petitioner's fixed assets and accumulated surplus. An analysis of petitioner's balance sheet figures for these years shows that petitioner's assets, which stood at $398,663.93 in 1941, had increased to $1,124,229.91 by 1951. By the end of the taxable year 1956,[3] the year here under discussion, these assets had grown to $2,301,604.74. During these same periods petitioner's surplus, designated in its balance sheet as "reserves," had increased from $311,079.97 in 1941, to $1,573,452.14 in 1951, and to $2,226,080.50 in 1956. Petitioner's annual revenues showed like increases after 1941, with the figures for petitioner's total gross revenues from all sources for 1941, 1951, and 1956 being, respectively, $290,804.60, $840,364.23, and $942,632.55.[4] The overwhelming portion of petitioner's gross revenues[5] and expenses[6] during the period under examination, as well as of the increase in the value of its assets, was connected solely with the operation of Tamiment.

By the year 1956 Tamiment had become the largest and one of the most modern summer vacation resorts in Pennsylvania, with rates ranging from $12 to $19 per day per person. As already noted, the American Socialist Society and the Rand School of Social Science, the motivating forces behind the creation of Tamiment as a site for summer retreats, had both ceased to exist. The resort was open to the public and competed with other vacation resorts in the Poconos. It employed more than 400 persons during the peak season and it advertised itself through newspapers, magazines and brochures as "Tamiment in the Poconos."

Tamiment's principal guest quarters in 1956 consisted of more than 160 furnished cottages, capable of accommodating about 900 persons, and located adjacent to a dining hall with a seating capacity of 1000. Set apart from the main complex of cottages was a group of bungalows known as Sandyville, designed for use by families with children, and which adjoined a play school and a small store. The other physical facilities which dotted Tamiment's grounds were of the type not uncommon to luxury va-

3. The figures showing the value of petitioner's assets at the end of its fiscal year 1957, as well as other figures for that year, were also set forth by the Tax Court. They indicate that the growth in petitioner's operations which preceded the taxable year 1956 continued at about the same rate during the next fiscal year.

4. Figures stipulated for fiscal years subsequent to 1956 indicate that petitioner's growth as reflected by its annual gross revenue has continued an upward trend. Gross revenues for 1957 totaled $979,579.07, while gross revenues for 1960 amounted to $1,115,932.39.

5. The revenue figures for fiscal year 1956 are fairly typical. Of the $942,612.55 in total gross revenues, $929,611.17 came from the following sources: gross income from guests at Tamiment resort; gross income from rentals of bungalows at Sandyville, a section of Tamiment designed especially for use by families;

and net income (no gross income or expense figures available) from taverns at Tamiment. Moreover, an additional $12,811.39 was realized as gross revenue from assets in the Mailly Educational Fund, which represents a segregation of a portion of petitioner's assets (derived largely from profits from Tamiment) which were placed in a special fund in 1944. While earmarked as a fund for educational purposes, the only disbursements which were made from the time of its creation through 1957 were annual payments of $2700 to help defray costs of operating a play school at the above mentioned Sandyville, and also, in 1956 and 1957, a minor portion of its assets were used in the erection of a new cultural center at Tamiment.

6. See table in this opinion, infra, setting forth certain of petitioner's expenditures which were not directly related to Tamiment's operation.

cation resorts catering to a young adult clientele: an administration building; a library; a lecture and concert hall; a ballroom building; an 18-hole golf course with a clubhouse containing a cocktail lounge; another clubhouse and dining terrace overlooking Lake Tamiment; a theater building; and facilities for various outdoor sports.

Also, Tamiment's activities included organized programs in the fields of drama, music and art, all available to guests of the resort free of charge. On Saturday evenings and Sunday afternoons the theater building was the scene of a dramatic or musical production staged by a theater group employed by petitioner for that purpose, and throughout the rest of the week the building was used for the exhibition of motion pictures. Orchestras hired on theater evenings to play for musical comedies and revues were customarily used after the performances to provide music at dances. Each week during the summer season vocalists and musicians performed concerts or gave recitals, and a lecture dealing with a topic connected with the arts or with public affairs was also weekly fare for those staying at the resort. Throughout each summer season an art director employed by petitioner gave free art instruction to interested guests, and professional artists were invited to display their works there and offer them for sale.

The most outstanding single cultural attraction at Tamiment was presented each year early in the summer vacation season, a chamber music festival featuring an orchestra and string quartet. The festival was open to members of the general public as well as Tamiment's paying guests, but a moderate fee was charged those attending who were not staying at the resort.

Though the operation of Tamiment constituted the great bulk of petitioner's activities during the period under review, petitioner also carried on other activities at the time, chiefly in New York City. In 1951 it acquired from the American Socialist Society a building in the city which housed the Rand School of Social Science, the school's library, the offices of an independent publication called the New Leader, and the principal corporate office of petitioner. When the American Socialist Society was dissolved in March of 1956, and the operations of the Rand School accordingly ceased, petitioner acquired all of the assets of the school's library and, after renovating it and hiring personnel to staff it, began itself to maintain and operate the library. Containing one of the largest and most complete collections of material dealing with the labor movement, Socialism, and Communism, the library was made freely available to all persons engaged in research in those fields.

Acting under the name of "Tamiment Institute," petitioner also undertook to sponsor and promote various other programs of public interest, mostly in New York City. In order to stimulate interest in American string quartet composition, petitioner promoted annual composition contests in this field of music, awarding prizes to original works adjudged the best. An annual book award luncheon was conducted, at which a prize was awarded by petitioner for the best biographical book of the year. Petitioner launched several programs to foster thought and discussion about important public issues. It discussed such issues from time to time in public service advertisements which it sponsored, and in pamphlets which it published and circulated itself. It also conducted numerous essay contests for college and university students. An annual public forum was held at which prominent citizens aired their views on matters of public concern, and, along these same lines, annual seminars were sponsored at Tamiment before the opening of the resort's summer season at which scholarly papers were read and discussed.

On March 3, 1956, the Commissioner of Internal Revenue wrote to petitioner, ruling that, inasmuch as petitioner was primarily engaged in operating a commercial enterprise, it was no

longer to be accorded an exemption from federal income taxes. Petitioner filed a corporate income tax return for its fiscal year 1956 but claimed exemption from the tax, and the Commissioner asserted against it a deficiency of $25,784.13. In the Tax Court proceedings below petitioner did not contest the correctness of the deficiency figure, but unsuccessfully defended on the sole ground that it was not liable for any tax at all since it was entitled to an exemption under Section 501(c) (4) of the 1954 Code. Section 501(c) (4) provides for an exemption from the income tax in the case of:

> "(4) Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes."

Petitioner, of course, seeks to take advantage of that part of the subsection exempting "[c]ivic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare." [7] To do so, petitioner must meet the three statutory conditions set forth in the subsection and demonstrate that: (1) it is a civic league or organization; (2) it is not organized for profit; (3) it is operated exclusively for the promotion of social welfare. Debs Memorial Radio Fund, Inc. v. Commissioner, 148 F.2d 948 (2 Cir. 1945).

Conditions (1) and (2) do not require extensive treatment. While at least one court has given the subsection a rather limited construction by defining the initial word "civic" narrowly and then regarding it as modifying both "leagues" and "organizations," Erie Endowment v. United States, 316 F.2d 151, 156 (3 Cir. 1963), neither party to these proceedings has raised any question as to the emphasis to be placed upon the word "civic" or the interpretation to be accorded it in construing Section 501(c) (4). Rather, they have both tacitly assumed that, even if the term does connote a limited genre of exempt organizations characterized by something other than social welfare operations, petitioner may be so classified, and they have confined themselves to an analysis of whether petitioner's operations in 1956 were exclusively of a social welfare nature.

This emphasis on the broader term "social welfare" is in line with the current regulations covering the subsection, which do not appear to give the word "civic" any real independent limiting effect but which only deal with organizations "operated primarily for the purpose of bringing about civic betterment and social improvements," Reg. § 1.501(c) (4)–(1) (a) (2), and is also in line with revenue rulings interpreting this and predecessor subsections,[8] e. g., Rev.Rul. 55–495, 1955–2 Cum.Bull. 259; Rev.Rul. 55–439, 1955–2 Cum.Bull. 257; GCM 24100, 1944 Cum.Bull. 192. This emphasis on the social welfare aspect of the subsection is also in accord with the weight of judicial authority; some courts apparently have not viewed the word "civic" as modifying "organiza-

7. The requirement set forth at the end of the subsection, that net earnings be devoted exclusively to charitable, educational, or recreational purposes, appears to involve a narrower range of activities than does the term "social welfare." It is clear, however, from the language of the subsection and its legislative history that the limitation does not apply to all organizations covered by the subsection, but simply to the employee organizations described in the lat-

ter part of it. See United States v. Pickwick Elec. Membership Corp., 158 F.2d 272, 276 (6 Cir. 1946); Hanover Imp. Soc. v. Gagne, 92 F.2d 888 (1 Cir. 1937). But see Erie Endowment v. United States, 316 F.2d 151, 156 (3 Cir. 1963).

8. In the rulings, "civic" is treated only as qualifying "leagues" and not "organizations," the latter term being regarded as modified only by the phrase dealing with social welfare operations.

tions" along with "leagues," and have therefore simply concerned themselves with whether an organization has been exclusively conducting social welfare operations, see Veterans Foundation v. United States, 281 F.2d 912 (10 Cir. 1960); Hanover Imp. Soc., Inc. v. Gagne, 92 F.2d 888, 891 (1 Cir. 1937); Amalgamated Housing Corp. v. Commissioner, 37 B.T.A. 817, 825, aff'd per curiam, 108 F.2d 1010 (2 Cir. 1940), and other courts have reached about the same result by talking about "civic organizations" but not defining "civic" in the limited sense of "municipal" or "community sponsored" but in broader terms closely related to the general concept of the promotion of social welfare, see Consumer-Farmer Milk Coop. v. Commissioner, 186 F.2d 68, 70 (2 Cir. 1950), cert. denied, 341 U.S. 931, 71 S.Ct. 803, 95 L.Ed. 1360 (1951); United States v. Pickwick Elec. Membership Corp., 158 F.2d 272, 276 (6 Cir. 1946); Debs Memorial Radio Fund, Inc. v. Commissioner, supra.[9] This view is also supported by the little legislative history one finds in explanation of the provision, for when it was first made a part of the tax laws, Section G(a) of the Income Tax of 1913, c. 16, 38 Stat. 114, 116, it was apparently included as a result of a belief that the provision then exempting religious, charitable or educational organizations was not broad enough to cover many non-profit organizations whose activities benefited the general public. See Briefs and Statements, Senate Committee on Finance, 63 Cong., 1st Sess. 2001 (1913). Therefore, we, too, will assume that petitioner is a "civic league or organization," and, as it also appears that petitioner makes no profit which inures to the benefit of any private individual, we now concern ourselves with whether petitioner has operated exclusively for the promotion of social welfare.

 Certain of petitioner's activities, not involving the commercial operation of the Tamiment resort, were found by the Tax Court to constitute the promotion of social welfare. These activities, which we have already outlined in some detail, were largely conducted in the New York City area and included such things as the maintenance of a free library on Socialism, Communism and the labor movement, the sponsorship of public forums and symposia, the promotion of musical composition and essay contests, and the circulation of pamphlets discussing important matters of public interest. We agree that these activities involved the promotion of social welfare as that term is used in Section 501(c) (4) of the Code. This court has characterized the promotion of social welfare as involving the serving of "purposes beneficial to the community as a whole," or the promotion of the "welfare of mankind" in the manner generally of the charitable, educational and religious organizations exempted by like provisions of the Code. Debs Memorial Radio Fund, Inc. v. Commissioner, supra, 148 F.2d at 951. These activities of petitioner, designed in the main to stimulate increased interest in the arts and public affairs and to provide the general citizenry with means for becoming better informed as to matters of public concern, amounted, we think, to the furthering of the beneficial interests of the community as a whole and therefore served to promote social welfare.

 Petitioner further urges us to characterize, as promoting social welfare, the various cultural activities which were conducted at Tamiment, and which were connected with that area's operation as a commercial vacation resort. Our attention is directed to the lectures, concerts, plays, and art exhibits which were regularly held during the resort's summer season, and to Tamiment's annual four-day chamber music festival. We agree with the Tax Court, however, that these activities, considered in their relation to the total operation of Tamiment, did not involve the promotion of social

9. But see Erie Endowment v. United States, supra, 316 F.2d at 156; Commissioner v. Lake Forest, Inc., 305 F.2d 814, 817–818 (4 Cir. 1962).

welfare at all. They were simply part and parcel of Tamiment's operation as a commercial resort, and were necessary features of a luxury vacation spot catering to a young adult intellectual clientele. As the director of Pennsylvania's state tourist promotion agency testified below, such cultural programs, while perhaps of a higher quality at Tamiment, were not unusual programs for ordinary commercial resorts in the Poconos that sought to draw the type of guests who frequented Tamiment. These activities, while no doubt broadening and beneficial to Tamiment's paying guests who enjoyed them, and, therefore, in a very remote sense, doubtless of some incidental aid to the general community of which these guests were members, cannot by any stretch of the imagination be considered any more beneficial to the community as a whole or any more promotive of the general welfare, as those terms have been used to define the statutory phrase, than Tamiment's golfing, swimming, or dancing activities. See Commissioner v. Lake Forest, Inc., supra; Consumer-Farmer Milk Coop. v. Commissioner, supra.

We come now to the important question of whether petitioner's operation of the resort Tamiment, not in itself an activity involving the promotion of social welfare, prevents the petitioner from obtaining a Section 501(c) (4) exemption as an organization operated exclusively for the promotion of social welfare. The word "exclusively" as used in the statute has not been given a strict interpretation, so as to foreclose every operation for a non-exempt purpose no matter how insubstantial, but rather has been interpreted to mean "primarily." Debs Memorial Radio Fund, Inc. v. Commissioner, supra, 148 F.2d at 952; see Sugarman & Pomeroy, Business Income of Exempt Organizations, 46 Va.L.Rev. 424, 425 (1960). Stated another way, "the presence of a single * * * [non-exempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly * * * [exempt] purposes." Better Business Bureau v. United States, 326 U.S. 279, 283, 66 S.Ct. 112, 114, 90 L.Ed. 67 (1945).

It was the nature of petitioner's operation of Tamiment as a commercial resort in active competition with other such businesses in the Poconos area, coupled with the relationship which the running of Tamiment bore to the total aggregation of petitioner's activities, that caused the Tax Court to conclude that petitioner was not operating exclusively for the promotion of social welfare. That court laid particular stress upon the fact that petitioner's expenditures for genuine social welfare activities constituted but a small fraction of its total revenues and paled in comparison with the total accumulated surplus which petitioner carried and which it had consistently increased over the years. The following table, drawn up by the Tax Court on the basis of its findings as to petitioner's financial activities, excellently demonstrates this point:

| Fiscal year ended Sept. 30 | Total Revenues | Expenditures for social welfare activities | Accumulated earned surplus |
|---|---|---|---|
| 1953 | $968,004.85 | $13,378.44 | $1,913,550.32 |
| 1954 | 956,911.51 | 28,550.86 | 2,036,911.38 |
| 1955 | 918,558.59 | 47,636.86 | 2,124,602.33 |
| 1956 | 942,612.55 | 44,684.76 | 2,226,080.50 |
| 1957 | 979,579.07 | 70,718.27 | 2,307,097.89 |

Moreover, petitioner spent substantial portions of its revenues in expanding and improving the facilities at Tamiment, with an extremely large addition to those facilities having been made during 1956, the taxable year here under review. During that year petitioner spent a total of $221,302.34 for capital additions. A comparison between petitioner's balance sheet figures for that year and those for the previous year indicates that of the total amount spent for capital additions, more than $200,000 was spent at Tamiment for buildings, equipment, and "permanent inventory," with the remainder being spent on books and equipment for petitioner's New York library.

■■ We agree with the Tax Court that, under these circumstances, petitioner's operations at Tamiment foreclosed a determination that it is an organization operated exclusively for the promotion of social welfare. See Scripture Press Foundation v. United States, 285 F.2d 800 (Ct.Cl.1961), cert. denied, 368 U.S. 985, 82 S.Ct. 597, 7 L.Ed.2d 523 (1962). True, none of petitioner's revenues from Tamiment have ever been turned over as profits to any private person,[10] and petitioner's formally declared purpose as originally set forth in its certificate of incorporation when it was organized in 1920 was to conduct activities of a social welfare nature. Moreover, it may well be that the persons currently responsible for directing petitioner's operations sincerely and honestly believe that their organization's primary purpose is still the promotion of social welfare. Nevertheless, the exemption granted to social welfare and like organizations is made in recognition of the benefit which the public derives from their social welfare activities, Trinidad v. Sagrada Orden, etc., 263 U.S. 578, 581, 44 S.Ct. 204, 68 L.Ed. 458 (1924), and we think it only fair to determine a particular organization's right to an exemption largely on the basis of the effect its operations have on the public. In terms of petitioner's purpose as demonstrated by the fact of its operations, and as demonstrated by the actual effect which those operations have on the community of which it is a part, petitioner cannot be regarded as primarily a social welfare organization entitled to a Section 501(c) (4) exemption, but rather it must be viewed as an organization whose primary purpose has in fact become the running of a commercial resort.[11]

■ Petitioner argues, however, that despite the relationship existing between its Tamiment expenditures and the amount of its revenues devoted to the promotion of social welfare, its Tamiment resort is no more than an income producing operation designed to finance its social welfare activities, and hence it is entitled to an exemption under the "destination of income" test. According to that test, first developed by this Circuit in 1938 largely on the basis of the Supreme Court's decision in Trinidad v. Sagrada Orden, etc., supra, the fact that an otherwise exempt organization conducts a commercial operation should not prevent the organization from qualifying for an exemption if the net income thereby realized is destined to be used for exempt purposes. Consumer-Farmer Milk Coop. v. Commissioner, supra; Debs Memorial Radio Fund, Inc. v. Commissioner of Internal Revenue, supra; Bohemian Gymnastic Ass'n Sokol v. Higgins, 147 F. 2d 774 (2 Cir. 1945); Roche's Beach, Inc. v. Commissioner, 96 F.2d 776 (2 Cir. 1938).

■ While petitioner's argument is not completely unpersuasive, we think that to use the destination test to exempt this petitioner from the income tax would

10. As noted earlier in our opinion, that an organization operates on a non-profit basis is only one of the requirements which must be met under Section 501(c) (4). In order to qualify for an exemption, an organization must also be operated exclusively for social welfare.

11. Were petitioner *admittedly* operated for the primary purpose of running a non-profit vacation resort, it is difficult to imagine where a large segment of its revenues would go if not toward expanding and improving resort facilities, and accumulating large reserves of surplus.

be an unnecessarily broad application of the test and one which would be out of keeping with the spirit and purpose of the social welfare exemption. The destination test ought not to be used to permit an entity to escape taxation where, as here, so much of its revenues are devoted to expanding its commercial facilities and increasing its surpluses, and so little of its revenues are actually spent for social welfare activities, that it is factually clear that the primary purpose of the organization is not really the promotion of social welfare but the running of a commercial operation.

Trinidad v. Sagrada Orden, etc., supra, the Supreme Court decision relied upon by this court as the original basis for the development of the destination test, provides no support for using that test in order to exempt an organization such as petitioner. In fact, a careful analysis of the facts before the Court in that case demonstrates that to use the destination test here would be to carry the rule developed from Sagrada Orden very far afield from the principles which were there set forth. The Court in Sagrada Orden interpreted an exemption which shielded from tax liability any corporation "organized and operated exclusively for religious, charitable, scientific, or educational purposes, no part of the net income of which inures to the benefit of any private stockholder or individual." The Government conceded that the entity, a Philippine corporation, was organized and operated for religious, charitable and educational purposes and that no part of its net income inured to the benefit of any private individual, but claimed that it was not operated exclusively for those purposes because of some income producing operations which it carried on. The great bulk of the income which was commercially derived consisted of rents, interest and dividends on properties which the corporation owned and held. The rest of it, consisting of only about 2.8% of the total income realized by the corporation during the taxable year involved, represented profits from the sale of wine, chocolate, and other articles used

by the corporation's churches and various subordinate agencies. The Court held that the corporation was exempt from taxation, noting that the statute "says nothing about the source of the income, but makes the destination the ultimate test of exemption." 263 U.S. at 581, 44 S.Ct. at 205, 68 L.Ed. 458.

What petitioner's argument fails to recognize is that the Court in Sagrada Orden when discussing the corporation's income producing operations took care to distinguish between its mere holding of property for the production of income and its merchandising or trading activities, a distinction which has also been recognized in certain current Code provisions which were in effect in 1956. Compare § 501(c) (2) and § 512(b) (1)–(3) with § 502; see H.R.Rep.No.2319, 81st Cong., 2d Sess. 124 (1950). Thus, the Court in discussing the Government's position in that case, characterized it as one which put aside as immaterial both the fact that "the income from the properties" was devoted exclusively to religious, charitable and educational purposes, "and also the fact that the limited trading, if it can be called such, is purely incidental to the pursuit of those purposes, and is in no sense a distinct or external venture," 263 U.S. at 581, 44 S.Ct. at 205, 68 L.Ed. 458; and, after explaining how the corporation in using its properties to produce income was actually adhering to and furthering its exempt purposes, the Court turned to a discussion of the corporation's trading activities.

The Court emphasized the fact that the corporation's sales operations were quite small, did not involve any selling to the public or competition with others, and could not really be called "engaging in trade":

"As respects the transactions in wine, chocolate and other articles, we think they do not amount to engaging in trade in any proper sense of the term. It is not claimed that there is any selling to the public or in competition with others. The articles are merely bought and supplied for use within the plaintiff's own organization and agencies—some of them for

strictly religious use, and the others for uses which are purely incidental to the work which the plaintiff is carrying on. That the transactions yield some profit is in the circumstances a negligible factor. Financial gain is not the end to which they are directed." 263 U.S. at 582, 44 S. Ct. at 206, 68 L.Ed. 458.

In the case at bar, of course, petitioner's Poconos resort operation is anything but small, and it competes actively for the public's business with other commercial resorts in the Poconos area. More importantly, unlike the corporation in the Sagrada Orden case, petitioner has, over the years, applied substantial portions of its income to expanding its business operations and to the building up of large accumulations of surplus.

Moreover, we find no substantial support for petitioner's position in any of the cases in which this court has, through an application of the destination test, held certain organizations exempt despite their conducting of commercial operations. Debs Memorial Radio Fund, Inc. v. Commissioner, supra; Bohemian Gymnastic Ass'n Sokol v. Higgins, supra;

Roche's Beach, Inc. v. Commissioner, supra.[12] The Roche's Beach decision, which granted an exemption to a "feeder" organization which did not itself conduct exempt activities but which channeled all of its profits to admittedly exempt organizations,[13] has been seriously undercut by a subsequent overruling amendment to the Internal Revenue Code enacted by Congress in 1950. Section 301(b), Revenue Act of 1950, c. 994, 64 Stat. 906, amending § 101, Internal Revenue Code of 1939, and now found in § 502 of the Internal Revenue Code of 1954. While the organizations held exempt in the two later cases conducted commercial operations to finance their educational or social welfare activities, such commercial operations were found to be merely incidental to their main tasks of either educating or of promoting social welfare. Neither of these cases involved commercial operations on the scale of petitioner's, and in neither of them, nor in the Roche's Beach case for that matter, was the organization using substantial portions of its revenues to accumulate large surpluses and to expand its income producing facilities.[14]

12. In the one other case in which this court had occasion to apply the destination test, Consumer-Farmer Milk Coop. v. Commissioner, 186 F.2d 68 (2 Cir. 1950), cert. denied, 341 U.S. 931, 71 S.Ct. 803, 95 L.Ed. 1360 (1951), the organization under examination was found not to be organized and operated exclusively for social welfare purposes. Inasmuch as the decision turned largely on the conclusion that the organization's operations benefited individual members financially, it is of little aid to us as a guide to the proper handling of the present case.

13. One of the reasons the majority gave for the result it reached was that the corporation would have been exempt had it, itself, been administering the exempt activities. 96 F.2d at 776. The dissenting judge, Hand, C. J., whose position as to the taxability of feeder corporations was eventually confirmed by congressional clarification of the then existing statute, argued that the exemption then given a limited class of feeder organizations was intended to be exclusive, and also indicated that even if petitioner were conducting the exempt activities itself only

limited business operations could be carried on without loss of exemption. 96 F.2d at 779.

14. In Bohemian Gymnastic Ass'n Sokol v. Higgins, an educational and recreational association realized income from the occasional renting of some of its facilities to the public, and from the regular operation of a bar and restaurant open to the public which grossed about $66,000 during the year 1942. There is no indication that any of this amount, which produced a net income of about $3,000, was used to accumulate surpluses or to add to the fixed assets of the commercial operation, except possibly part of that reflected by a $700 increase in the organization's inventory.

In Debs Memorial Radio Fund, Inc. v. Commissioner, a radio station originally organized for only public service broadcasting, finding itself in financial distress, undertook to use a portion of its broadcasting time for commercial programming to finance its operations. Though no precise figures were included in the case as to the distribution of broadcasting time between public service and com-

We think that more helpful guidance as to the proper tax treatment to be accorded petitioner can be found in certain remedial amendments which Congress in 1950 added to the Internal Revenue Code of 1939 and which have been carried over intact into the 1954 Code.[15] One of them, now Section 502 of the Code, was designed to clarify existing law, and we have already alluded to it briefly. Overruling the decision of this court in *Roche's Beach, Inc. v. Commissioner, supra*, it prohibited extending exemptions to "feeder" organizations, or to those which are conducted primarily as business operations but which turn over all of their profits to charitable, social welfare, or like organizations. Another 1950 amendment, now Section 511 of the Code, imposed a tax on the "unrelated business income" of certain organizations otherwise exempt from taxation. While neither of these amendments is squarely applicable to petitioner's situation, we think they do shed some light on the problem confronting us.

Section 502 of the Code, which denies exempt status to an entity primarily engaged in business, even though all its net income is ultimately channeled to truly exempt organizations, does so without regard to whether any of the particular feeder's gross income is first used to expand and improve its own capacity as a business. All feeder organizations, even those not interested in using *any* part of their gross revenues to expand their own operations, are declared taxable. In view of this we think it would be somewhat inconsistent, in dealing with the problem of the taxability of other organizations, to permit an entity like petitioner to attain exempt status while devoting considerable energy to improving and expanding an already large business operation. Moreover, the Congressional purpose behind the 1950 enactment of both the feeder provision now in Section 502 and the unrelated business income amendment now in Section 511 was to prevent organizations with tax exempt status from competing unfairly with ordinary, taxed business entities. See S.Rep.No.2375, 81st Cong., 2d Sess. 26–31, 35–36 (1950), U.S.Code Congressional Service 1950, p. 3053; H.R.Rep.No.2319, 81st Cong., 2d Sess. 36–38, 41–42 (1950); H.R.Doc.No.451, 81st Cong., 2d Sess. 5 (1950). And, while it appears that the Section 511 amendment was not supposed to change the existing rule for determining tax exempt status, we think that the Congressional purpose behind both it and the feeder provision [16] instructs us not to apply the destination test broadly but to deny exempt status to petitioner, an entity which has directed so much of its revenues toward improving its ability to compete as a commercial operation through the accumulation of large surpluses and the expansion of its income producing facilities.

Affirmed.

---

15. For a discussion of the legislation and its background history, see Veterans Foundation v. United States, 281 F.2d 912 (10 Cir. 1960); United States v. Community Services, Inc., 189 F.2d 421 (4 Cir. 1951), cert. denied, 342 U.S. 932, 72 S.Ct. 375, 96 L.Ed. 694 (1952).

16. The feeder amendment, of course, was explicitly designed to take away tax exempt status from an entire class of organizations which had enjoyed an exemption up to that time. And, as noted above, to the extent that the treatment of organizations which are not feeders should be consistent with the change, the amendment also affected, to some degree, the exempt status of other organizations.

mercial programs during the taxable year, it appears that the majority of the total time, and all of the prime evening time, was devoted to public service broadcasts. Improvements in the station's facilities were made largely through advances from charitable foundations, but of course those improved facilities directly served public service purposes as well as helped to produce income. No sizable surpluses were accumulated; in fact, the court noted that up to the end of the period under review the station's operating expenses had exceeded its operating receipts by some $37,000.

HAYS, Circuit Judge (dissenting):

Not only is the majority unable to cite a single authority in support of its conclusion, it is, as I see it, departing from a line of controlling authority firmly established for many years in our own circuit. Nothing in the case before us justifies this break with the past. In fact the equities of the case cry out for the continued application of that construction of the relevant statute which this court has so long followed.

The majority opinion dismisses as hardly worth serious consideration the contention that such activities at Camp Tamiment as the following are social welfare activities:

Weekly lectures on art, music, literature, current affairs, anthropology, psychology and human relations;

Weekly concerts by vocalists and instrumentalists of international reputation;

Daily concerts and lectures on music by a resident professional pianist;

An annual four day music festival featuring outstanding chamber music orchestras and string quartets;

A subsidized experimental theatrical group composed of a professional director, writers, composers, lyricists, arrangers, designers of scenery and costumes, actors, actresses, dancers and others, which produced new and original plays;

A professional orchestra for productions in the theatre;

A resident professional artist and art teacher giving instruction without charge in painting and drawing;

Exhibitions of painting and sculpture with an annual prize for painting.

The question which the majority opinion fails to answer is:

If these and the other activities of the camp were not for social welfare purposes, what *was* their purpose?

It is conceded that the camp is not operated for the purpose of earning a profit for any objective except an admittedly social welfare objective. The camp has no such "commercial purpose" as the Supreme Court found in Better Business Bureau v. United States, 326 U.S. 279, 66 S.Ct. 112, 90 L.Ed. 67 (1945). Its operation is not designed to benefit any group "economically." See Consumer-Farmer Milk Coop. v. Commissioner, 186 F.2d 68 (2d Cir. 1950), cert. denied, 341 U.S. 931, 71 S.Ct. 803, 95 L.Ed. 1360 (1951); American Institute for Economic Research v. United States, 302 F.2d 934 (Ct.Cl.1962), cert. denied, 372 U.S. 976, 83 S.Ct. 1109, 10 L.Ed.2d 141 (1963).

To the extent that the camp was operated for "cultural" purposes, i. e. education in art, music, literature, politics, etc., the encouragement of experiment in the theater, and of excellence in music, sculpture and painting, then surely its purposes were social welfare purposes. To what other purpose is to be ascribed its provision of rest and recreation for young people interested in these cultural purposes? It seems to me to be impossible to find any rational formulation of the purposes of the camp which can be phrased in any terms other than social welfare. It is significant, I believe, that the majority does not even attempt to formulate any alternative.

There is some suggestion in the majority opinion that the activities of the camp cannot be social welfare activities if a charge is made to the participants. This position proves on reflection to be absurd, since it would eliminate from tax exemption universities which charge tuition, hospitals which charge for medical services, art galleries and historical museums which charge admission fees, churches which charge pew rentals, and some examples of almost every other imaginable type of social welfare organization. In fact to concede that the activities of the camp would be social welfare activities if provided free of charge is practically to concede the correctness of petitioner's position.

But assuming *arguendo* that the cultural and recreational aspects of the operation of the camp do not have a social

welfare purpose, then, by clear authority this circuit is bound to the destination test, i. e. the rule that the purpose of the activity is a social welfare purpose if the profits from the operation of the "business" are used for social welfare objectives. Trinidad v. Sagrada Orden, 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458 (1924); Roche's Beach, Inc. v. Commissioner, 96 F.2d 776 (2d Cir. 1938); Bohemian Gymnastic Ass'n Sokol v. Higgins, 147 F.2d 774 (2d Cir. 1945); Debs Memorial Radio Fund, Inc. v. Commissioner, 148 F.2d 948 (2d Cir. 1945). See also Willingham v. Home Oil Mill, 181 F.2d 9 (5th Cir.), cert. denied, 340 U.S. 852, 71 S.Ct. 80, 95 L.Ed. 624 (1950); Lichter Foundation, Inc. v. Welch, 247 F.2d 431 (6th Cir. 1957); Boman v. Commissioner, 240 F.2d 767 (8th Cir. 1957).

But, says the majority:

"The destination test ought not to be used to permit an entity to escape taxation where, as here, so much of its revenues are devoted to expanding its commercial facilities and increasing its surpluses, and so little of its revenues are actually spent for social welfare activities, that it is factually clear that the primary purpose of the organization is not really the promotion of social welfare but the running of a commercial operation."

Not only is there no authority whatsoever for any such exception to the destination test, but the majority's analysis of the situation cannot survive scrutiny. What the majority is saying, in effect, is that no organization can properly be classified as a social welfare organization if it devotes a certain proportion of its income to expanding its facilities, whatever may be the purpose of such expansion. (Repeated use by the majority of the word "commercial" to describe the operations of the camp should not be permitted to prejudice consideration of the real character of those operations. They are, of course, not "commercial" operations in the ordinary or usual sense of

that word since they are not designed for private profit.)

The majority's analysis is deficient in another material respect. It refers to the proportion of the petitioner's "revenue" which is devoted to "expanding its * * facilities and increasing its surpluses." Both here and in the table reproduced on page 931, the argument is presented as if "facilities" and "surpluses" were two separate and distinct items, as if the camp had, in addition to its "facilities" some two million three hundred thousand dollars salted away somewhere in cash. Of course the largest part of petitioner's "surpluses" is represented by its "facilities." "Accumulated earned surplus" is merely the bookkeeping item of liability which balances assets.

Moreover, the "revenue" to which the majority refers is the gross revenue before deduction of any expenses. Using gross revenue in this way suggests that the majority would hold that any organization which has a large operation in money terms cannot be a social welfare operation. (The attempt to distinguish the destination cases is largely based on the argument that the operations in those cases resulted in smaller revenues than in the present case.) There is, of course, no justification whatsoever to support such a position. Nothing in the statute or in any of the cases suggests that the size of an operation has any bearing on whether it is a social welfare organization.

If we use the much more significant figure of net operating revenue, that is, gross revenue less expenses of operation, we find that, even excluding cultural programs and activities, the proportion of concededly social welfare expenditures ranges in the years 1956 to 1960 from 53% to 89% (and that it was 53% in 1956, the tax year in question). The following table also shows that if the expenditures for cultural activities are added to the expenditures which are admittedly for social welfare, a very large proportion of operating revenue went for the total of the two purposes.

938

| | 1956 | 1957 | 1958 | 1959 | 1960 |
|---|---|---|---|---|---|
| Contributions to League for Industrial Democracy* | $ 4,000.00 | $ 4,000.00 | $ 4,000.00 | $ 3,000.00 | $ 3,000.00 |
| Brandeis University | — | — | 2,000.00 | — | 2,500.00 |
| University of Scranton | — | — | — | — | 100.00 |
| Physical recreation expenditures | 28,147.33 | 22,981.39 | 27,146.67 | 31,578.95 | 24,228.13 |
| Total—"Costs of other activities" | 32,147.33 | 26,981.39 | 33,146.67 | 34,578.95 | 29,828.13 |
| "Cultural programs and activities" per Judge Pierce | 82,746.41 | 87,178.45 | 97,792.47 | 91,164.60 | 108,071.51 |
| (1) Total excluded by Judge Pierce from "social welfare" expenditures | 114,893.74 | 114,159.84 | 130,939.14 | 125,743.55 | 137,899.64 |
| (2) Operating revenue | 119,147.03 | 232,487.58 | 276,082.70 | 258,311.51 | 219,619.38 |
| (3) Adjusted operating revenue (item (2) less item (1) above) | 84,253.29 | 118,327.74 | 145,143.56 | 132,567.96 | 81,719.74 |
| (4) "Social welfare" expenditures per Judge Pierce | $ 44,684.76 | $ 70,718.27 | $ 78,194.54 | $ 83,751.40 | $ 72,610.13 |
| (5) Per cent which item (4) is of item (3) above | 53 | 60 | 54 | 64 | 89 |

* These contributions were for the education program, among the students, on campuses of universities in this country.

———◆———

Additions to reserves ranged in the years 1956 to 1960 from 4% to 24% of operating revenue. The addition to reserves was 20% of operating revenue in 1956.

The majority seek to find support for their conclusion in the adoption of two statutes by Congress in 1950. The first, now Section 502 of the Code, withdrew exemption from "feeder" organizations. The other, now Section 511 of the Code, imposed a tax on the unrelated business income of certain organizations otherwise exempt from taxation. Admittedly neither of these statutes is applicable to petitioner. Far from lending support to the conclusion reached by the majority, the fact that Congress adopted these statutes to remedy the particular situations with which they dealt, excluding from their application the social welfare organizations described in Section 501(c)

(4), would seem to support the conclusion that Congress was satisfied with the working of the statute applicable to petitioner and intended no change. However, we need not speculate on the Congressional purpose since the Report of the Committee on Finance on the Revenue Bill of 1950 (Sen.Rep.No.2375, 81st Cong., 2d Sess., 1950-2 Cum.Bull. 483, 504–505) U.S.Code Congressional Service 1950, p. 3080, stated with respect to the statutory amendments:

> "It is important to note that many organizations now exempt from income tax under section 101 of the Internal Revenue Code [of 1939] are not affected by these tax measures. * * * These include * * * civic leagues; social welfare organizations; * * *

> " * * * In fact it is not intended that the tax imposed on unrelated business income will have any effect on the tax-exempt status of any organization. An organization which is exempt prior to the enactment of this bill, if continuing the same activities, would still be exempt after this bill becomes law. * * *"

If we are to look to other statutes for support for one position or the other, the majority's view that the accumulation of surplus is a ground for withdrawing exemption is dealt a powerful blow by consideration of Section 504 of the Code which expressly provides that exemption shall be denied charitable and educational organizations "if the amounts accumulated out of income during the taxable year or any prior taxable year and not actually paid out by the end of the taxable year—(1) are unreasonable in amount or duration in order to carry out the charitable, educational, or other purpose or function constituting the basis for [their] exemption * * *." Social welfare organizations are not subject to the provisions of Section 504. The majority is, then, clearly in error in reading the limitations of Section 504 into the section on social welfare organizations.

See Erie Endowment v. United States, 316 F.2d 151, 156 n. 21 (3d Cir. 1963).

It seems to me quite clear on the basis of logic and authority, as well as because of the equities of the case with which we are presented, that the decision of the Tax Court must be reversed.