Los Angeles County Remount Association v. Commissioner.
Los Angeles County Remount Asso. v. Commissioner
Docket No. 4555-66.
United States Tax Court
T.C. Memo 1968-210; 1968 Tax Ct. Memo LEXIS 89; 27 T.C.M. (CCH) 1035; T.C.M. (RIA) 68210; September 23, 1968. Filed Hampton Hutton, 725 Citizens Nat'l Bank Bldg., 453 S. Spring St., Los Angeles, Calif., for the petitioner. Eli Blumenfeld, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax for the calendar years 1962 and 1963 in the respective amounts of $17,697.05 and $448.98. The issue for decision is whether petitioner qualifies as an exempt organization not organized for profit but operated exclusively for the 1036 promotion of social welfare, under section 501 (c) (4), I.R.C. 1954. [1]
Findings of Fact Some of the facts have been stipulated and are found accordingly. *91 Los Angeles County Remount Association (hereinafter referred to as petitioner or "the association,") was incorporated "as a nonprofit corporation" under the laws of California on June 20, 1944. Petitioner's principal office was located at Los Angeles, California, at the time the petition was filed in this case. The purposes of the association as stated in its Articles of Incorporation were as follows: ARTICLE II. The purposes for which the corporation is formed are: To provide, acquire and maintain facilities, stables, rings, paddocks, buildings, transport horses and equipment for the training of men and horses for use and assistance to the County of Los Angeles in time of emergency, catastrophe or major disaster. To provide and maintain adequate mounts, stables, facilities, buildings and equipment for teaching horsemanship, horsemastership, the care and training of horses to members of the Los Angelew [sic] County Sheriff's Reserve, to peace officers in Los Angeles County, and other interested groups. To dispense information to people desiring to learn horsemanship and who desire to become competent horsemen. To encourage and promote horsemanship and horsemastership *92 in all manners and ways, and to promote and instruct in military horsemanship and mounted calvary [sic] maneuvers. To provide and maintain horse shows and the necessary facilities and equipment therefor. To render guidance and assistance and to train personnel for active duty and assistance in time of emergency, catastrophe or major disaster. To obtain and provide funds for the relief of stricken, disabled or destitute members of the Los Angeles County Sheriff's Reserve. To maintain membership and representation in and upon the Advisory Council of the Major Disaster Emergency Council of the County of Los Angeles, and other similar or allied organizations, and in every manner assist, advise, promote and effect adequate facilities and measures for the protection and safety of life and property during times of emergency, major physical disaster or catastrophe. * * * The Articles of Incorporation contain the following provisions concerning profits to members, membership and property rights: ARTICLE III. That this corporation is one which does not contemplate pecuniary gain or profit to the members thereof; that no part of the earnings of this corporation, if there be any *93 earnings, shall inure to the benefit of any member or individual. * * * ARTICLE VII. That the members of this corporation shall be those above designated, and such others as may be hereafter admitted to membership in accordance with the Bylaws of this corporation; that matters relative to membership, property, voting, rights and privileges of members and liability of members of the corporation to dues, or assessments and method of collection thereof may be set forth in the By-laws of this corporation. ARTICLE VIII. That all property rights and interests and voting powers and privileges attendant upon and connected with membership in this corporation shall be vested in and be limited and restricted to the members of the corporation exclusively. Cumulative voting shall not be permitted, but each member may vote any act by proxy. ARTICLE IX. That this is a membership non-profit corporation; that there is no capital stock and there are no shares of stock; that this is a corporation, which does not contemplate pecuniary gain or profit to the members thereof; that neither the members, nor directors shall be personally liable for the debts, liabilities or obligations of the corporation; *94 that the board of directors shall not have power to levy or collect assessments against or from any of the members of the corporation except as may be provided in the By-laws of the corporation. The Articles of Incorporation contain no provisions concerning dissolution. 1037 The original bylaws of the association, adopted on June 20, 1944, contained the following provisions as to membership: 11. There shall be but one class of members and the interests and rights of each member in the property and assets of the corporation shall be equal and each and every member shall have one unit of property right and interest in said property and assets. In order to be eligible for membership in this corporation, each member must be a member in good standing of the Los Angeles County Sheriff's Reserve. Furthermore, no membership shall be transferable except by consent of the Board of Directors. 12. New members shall have the same voting power and property rights as all other members. 13. When a member ceases to be eligible to membership, his rights as a member automatically shall be suspended and he shall thereby discharge and release the corporation and other members therof *95 from any claim to any of the property or assets of the corporation. 14. Membership certificates shall be issued to each member in form designated by the Board of Directors; each certificate shall be signed by the president and secretary and the corporation seal affixed; each certificate shall have designated upon the face thereof that this corporation is a non-profit corporation. 15. That there shall be kept by the secretary a membership book containing the name and address of each member and in any case where membership has been terminated such fact shall be recorded together with the date on which the membership ceased. 16. All members shall have the right and privilege at any time of withdrawing at any time by giving notice in writing of resignation, which resignation shall be effective forthwith upon receipt thereof. At a meeting of the membership of the Association on June 5, 1951, sections 11 and 13 of the bylaws were amended to read as follows: Section 11, paragraph 2: "In order to be eligible for membership in this corporation, each member must be a member in good standing of Sheriff's Headquarters Posse #14." [Later designated as Posse 15] Section 13: "When a *96 member ceases to be a member in good standing of the Sheriff's Headquarters Posse #14 his rights as a member of the Los Angeles County Remount Association automatically shall be suspended, and he shall thereby discharge and release the corporation and other members thereof from any claim to any of the property or assets of the corporation." At a meeting of the membership of the corporation on February 10, 1965, sections 11 and 13 as amended were amended to read as follows: By-Law No. 11. There shall be but one class of members and the interests and rights of each member in the property and assets of the corporation shall be equal and each and every member shall have one unit of property right and interest in said property and assets. In order to be eligible for membership in this corporation, each member must presently be a member or must have beenn a former member in good standing of the Los Angeles County Remount Association. Any person not already a member and who meets the foregoing eligibility requirements shall be entitled to make application to become a member and upon majority vote of the Board of Directors or upon majority vote of the members shall be admitted to membership *97 of this corporation. Furthermore, no membership shall be transferable. By-Law No. 13. When a member of this corporation ceases to be a member in good standing of this corporation all his rights as a member thereof automatically shall be suspended and his rights and claims to any of the property or assets of the corporation terminated, and likewise this corporation and all other members thereof thereupon shall be released and discharged of any and all of his rights and claims to any of the property or assets of the corporation. The amendments made on February 10, 1965, were adopted at the request of members of the association who became ineligible to remain members of the Sheriff's Headquarters Posse because of a new lower age limit prescribed by the Sheriff's department for membership in the Sheriff's posse. By letter dated March 7, 1946, respondent ruled that, based on the facts submitted, petitioner was an exempt organization within the meaning of section 101(8), I.R.C. 1939. Section 101(8), I.R.C. 1939, is the predecessor of section 501(c)(4), I.R.C. 1954, substantially unchanged. The "evidence submitted" by the association to respondent for use in *98 determining the status of the association for Federal tax purposes was summarized in the letter of March 7, 1946, as follows: You were incorporated in July 1944 as a nonprofit corporation without capital stock to provide, acquire and maintain facilities and equipment necessary for the 1038 training of men and horses for use and assistance to the County of Los Angeles in time of emergency, catastrophe or major disaster; to provide equipment and facilities to members of the Los Angeles County Sheriff's Reserve, peace officers in Los Angeles County, and other interested groups; to dispense information to people desiring to learn horsemanship, including the teaching of horsemanship and instruction in military and mounted cavalry maneuvers; to provide facilities and equipment for horse shows; to obtain and provide funds for the relief of stricken, disabled, or destitute members of the Los Angeles County Sheriff's Reserve; to purchase, sell or in any other manner deal in every kind of real or personal property, goods, wares and merchandise; and to do any and all things necessary or expedient for the attainment of your purposes not otherwise prohibited by law. Your funds are used solely *99 for the maintenance of a horse troop and equipment as a unit for use in times of major catastrophe or disaster. Respondent subsequently revoked petitioner's exempt status, by letter dated April 29, 1966, with the following explanation: The information before us does not show that you have been carrying out your stated purposes. However, it does show that you have been engaging in an operation known as the "Pepper Tree Ranch." This activity consists primarily of boarding, rental of four horses owned by you and the collection of fees for the use of your grounds by persons wishing to ride or exercise their own horses. These activities are conducted in a commercial manner and are not exempt activities within the intendment of Section 501(c) (4) of the Code. During the years 1946 to 1965 petitioner filed Forms 990, Return of Organization Exempt from Income Tax, setting forth its receipts and expenditures. These returns were filed with the district director of internal revenue at Los Angeles for the years here in issue. The Los Angeles County Sheriff's Reserve is composed of a number of units in various areas of Los Angeles County which provide volunteer assistance to the sheriff. *100 Some of the units are mounted troop units designated as posses. There were 16 mounted posses in 1962 and 1963, and in addition 23 unmounted units of the Sheriff's Reserve which assist in regular police work, both on foot and in motor vehicles, and which do mountain rescue work. Posse 15, which prior to the years here in issue had been designated as Posse 14, is known also as the Headquarters Unit because of its location in the city of Los Angeles. The term "Posse 15" as used hereinafter refers to this headquarters posse unit without regard to time. The other mounted posses were located in parts of Los Angeles County outside the city limits of the city of Los Angeles. Posse members must know how to care for and ride a horse. Each posse member must own or have a horse available to him. In addition, posse members must undergo a training program in law enforcement and in the use of firearms. Posse members are expected to practice on the pistol range monthly and to ride once a week. Members of the Sheriff's Reserve, including members of the mounted posse units, receive no compensation. Posse members receive no financial aid from the Sheriff's department or from Los Angeles County in *101 the purchase or upkeep of their horses. During the years 1962 and 1963 the average number of members of all mounted posse units of the Sheriff's department was 425 and 365, respectively, and the average number of members of the other units of the Sheriff's Reserve were 971 and 799, respectively. Many of the members of posse units other than Posse 15 kept their horses on their own property and some kept their horses at commercial stables. The membership of Posse 15 has declined. At one time it reached 58, but there were only 12 members in 1963, 11 in 1964, and 8 at the time of the trial of this case in January 1968. Posse 15 (Headquarters Unit) contributed a total of 1,884 man-hours of service to the Sheriff's office during 1963. The entire 1,884 man-hours were contributed in the form of "training." No man-hours were contributed under the other categories listed in the annual report of the Sheriff's Reserve such as Patrol, Rescue and Community Services. The total, 1,884 man-hours, amounts to 157 per man in 1963, or 3 hours per week per man. Members of Posse 15 were not obligated to join the association but most of the members of Posse 15 have belonged to the association since its *102 organization. Members of Posse 15 who joined the association paid a $100 membership fee. This fee remained the same from the time petitioner was organized throughout the years here in issue, except for a brief period when the fee was raised to $350. No members joined at the $350 rate, and the fee was reduced 1039 again to $100. There are no dues in the association. Prior to petitioner's formation the members of Posse 15 had been putting $5 each into a "kitty" at each meeting looking toward developing a fund to acquire riding facilities. One of the members obtained an option on certain property known as "Peppertree Ranch" and petitioner was formed to acquire and hold title to Peppertree Ranch which was acquired at approximately the date of petitioner's incorporation in 1944. Peppertree Ranch consisted of 4 acres on the Los Angeles River, with accessibility to the horsetrails of Griffith Park. There were an old house and barn and a few ramschackle horse stalls on the ranch when it was acquired. The association paid $1,000 cash down for the property and assumed a mortgage payable at $75 per month, principal and interest. The association bought 10 surplus Army horses shortly after *103 the war and increased the mortgage by $4,000 in order to build a 12-stall barn with tack rooms. In addition, the association built an electrically lighted riding ring and a "roof under which to store hay." Prior to 1963, there were 37 stalls on the ranch. The association kept its horses on the ranch. In 1964, it owned only 6 or 8 horses. Posse members who individually owned horses also kept them at the ranch. There were never more than 5 to 7 members of Posse 15 who owned horses. These members paid a stable or boarding fee for keeping their horses at Peppertree Ranch which was generally $5 less per month than the boarding fee paid by other persons. The amount of stall rents and boarding fees have varied during the years dependent to an appreciable extent on the costs of feeding and sheltering a horse but, except for a very short time when members paid $10 a month less than others for stall rental and boarding fees, the differential of $5 for charges to members has remained constant. By 1963 the cost to the association of boarding a horse was approximately $60 a month. Although members of Posse 15 were not required to join the association, all such posse members contributed a certain *104 amount of time to the general upkeep of the ranch. The posse would hold "work Sundays" when its members would come and cut weeds, mend the stalls, and do other necessary work. The association at all times during the years 1954 to 1964 hired at least two full-time employees to take care of the ranch. Wages paid to employees during the years 1961, 1962, 1963, and 1964 were $5,871.05, $6,723.50, $6,141.00, and $7,868.60, respectively. The posse members paid $3 a month dues to the posse. In addition, those who did not own horses paid an extra amount to the posse to cover riding fees. Posse 15 paid the association $130 a month as a riding fee for its members. This entitled each member of Posse 15 who did not own a horse to ride five times a month. When the association began operation, only posse members were allowed to keep and board their horses at the ranch. Two or three years later when extra stall space became available, such space was rented to persons other than posse members. The first such persons to rent space were members of the Bit and Bridle Club. Some of the members of the Bit and Bridle Club were wives of posse members. Some of the Bit and Bridle Club members brought their *105 horses to Peppertree Ranch and rented stalls; others paid riding fees to use horses belonging to the association. When stalls were first rented to persons other than members of Posse 15, there was no "boarding" of horses owned by persons other than members of Posse 15. By 1954, however, the association was receiving both "boarding" fees and "stable-rental" fees from the general public. "Boarding" included feed for the horse, whereas "stable rental" did not include feed. Other groups which used the facilities at Peppertree Ranch to keep their horses and to ride were an auxiliary to the posse and the Glendale Women's Athletic Club. In addition, "friends" of the posse members and of the Bit and Bridle Club members came and took riding lessons at Peppertree Ranch and sometimes joined one or the other organization. Individuals who were not associated with any group which used the facilities of Peppertree Ranch or were not introduced by a member of such a group as a "friend" possibly interested in joining the group could not come in and rent a horse for a ride, or take riding lessons at Peppertree Ranch. However, if there were empty stalls available for rental, the association made this *106 fact known by word of mouth or by a note so stating on horse show class lists and programs. In this way, individual members of the general public used the facilities at the ranch. Riding fees rose from $1 per ride to $3 per ride over the years, but Posse 15 always paid $130 per month for riding privileges 1040 for its members. Horses owned by the association and sometimes privately owned horses were used for paid rides. Riding fees earned by privately owned horses were deducted from the monthly board or stall rental paid by the owner of the horse. Posse 15, the Bit and Bridle Club, and the other groups held horse shows at Peppertree Ranch from about 1954 through the years here in issue. All or part of the proceeds of these horse shows, which were open to the public, were given to the association. The association received $295.64, which constituted 40 percent of the profit from a horse show which was held by the California Women's Cavalry in July 1962. Shortly thereafter, the association received in partial payment of proceeds from a horse show $475 from the Bit and Bridle Club. The entire profits from shows held by Posse 15 were given to the association. Proceeds from the horse *107 shows were not separately shown on petitioner's income statements. At least in some instances proceeds from these shows were accounted for under "stall rental." These horse shows were advertised by mail to a list of interested persons which the association maintained and by posters placed on display at various stables. Occasionally a notice of such shows would be placed in a paper entitled, "Equestrian News." The horse shows sponsored by Posse 15 were not official functions of the posse. They were not sanctioned by the Los Angeles County Sheriff's Department. The members of Posse 15 who conducted these horseshows in the posse's name were also members of the association. There was no charge for spectators at the horse shows. An entrance fee was charged to those persons entering horses in the show. From 1944 to 1947 and from 1954 to 1964, petitioner had gross receipts, net profits, and an earned surplus in the amounts shown in the following table. Also shown is the amount and percentage of revenues derived from the general public. *11 Receipts from general public
Year
Gross receipts
Amount
Percentage of grossreceipts
Net profit
Earnedsurplus
1944
$ 1,976.66
$1,519.30
$ 1,519.30
1945
1,809.13
542.82
2,062.12
1946
4,112.35
44.99
2,107.11
1947
10,031.96
1,729.56
3,836.67
1954
13,073.19
$ 6,710.85
51
1955
16,238.97
8,451.16
52
1956
14,623.02
7,504.10
51
8,129.64
1957
16,740.75
9,890.1 5
59
773.50
8,903.14
1958
16,670.23
9,850.54
59
1959
17,233.93
9,961.61
58
1960
20,120.00
14,027.00
70
5,990.31
1961
23,334.94
17,199.94
74
3,195.11
9,185.42
1962
[1] 20,006.84
10,449.38
69
[1] 1,452.18
n2 10,637.60
1963
23,012.85
14,991.90
71
1,175.85
11,813.45
1964
24,050.89
17,618.99
74
*108 There were about 16 other stables in the general area of petitioner's property which were operating commercially. The property owned by petitioner is larger than the property on which some of these other stables are located and smaller than the property on which others were located. By 1963 petitioner was offering substantially the same services as the commercial stables except for grooming of horses. The properties on which the 16 stables which operated commercially were located had approximately the same access to the horsetrails in Griffith Park as petitioner's property. Petitioner never contributed any money to the Los Angeles County Sheriff's Department for any purpose and made no money contribution to any other person or organization. During a short period of time just prior to the years here in issue, petitioner permitted certain blind children who were members of an association for blind children to ride its horses *109 for a few hours on a few Saturday mornings free of charge. All services furnished or rendered by petitioner to any other persons or organizations were for a charge, the charge made for riding by members of Posse 15 of the association's horses being the $130 per month paid by Posse 15 to the association as heretofore set forth. 1041 The association was constantly under pressure to generate enough income to meet expenses. The largest single expense of the association other than the direct upkeep of the horses boarded on the association's property was real estate taxes. In 1961, the association paid $3,889.40 in state and local taxes. In the latter half of 1961 the city of Los Angeles was attempting to have the association correct sanitary and safety defects on its property. At a special meeting of the members of the association on November 22, 1961, the board of directors was authorized to negotiate for the sale of a part of the association's real estate "with the proceeds of such sale to be used solely for a building program under the city code." In February 1962, the chairman informed the board he had a "possible prospect" for the purchase of part of the land. A sale of approximately *110 one acre of the association's land was concluded on September 24, 1962, for $80,000, which resulted in net proceeds of $67,916.32 to petitioner. [2]
On the information return (Form 990) which petitioner filed for the year 1962 petitioner showed a gain on the sale of a portion of the land of $70,788.21, which it set up on its books as a reserve for replacement of buildings and improvements. The entire proceeds from the sale have been used for the construction of new stables and a clubhouse similar to the old one and to correct unsanitary and unsafe conditions in accordance with the directives of the Los Angeles Department of Building and Safety. Respondent, pursuant to his revocation of petitioner's exemption, determined *111 deficiencies in petitioner's income taxes for the calendar years 1962 and 1963. Opinion Section 501(c)(4) provides for the exemption from Federal income tax of civic leagues or organizations "not organized for profit but operated exclusively for the promotion of social welfare." Therefore, in order for petitioner to bring itself within the provisions of the statute, it must identify the purpose of its operation as being "social welfare" and must show that it is operated exclusively for the promotion of such social welfare. The term "exclusively" as used in this statute is interpreted to mean "primarily." People's Educational Camp Society, Inc. v. Commissioner, 331 F. 2d 923 (C.A. 2, 1964), affirming 39 T.C. 756 (1963). This Court, in People's Educational Camp Society, Inc., 39 T.C. 756, 768 (1963), stated with respect to the requirements for exemption from income tax under section 501(c)(4) that "both the pertinent Treasury regulation and judicial authority recognize that the existence of a primary or predominant purpose to yield benefit to the community *112 as a whole is an essential prerequisite to the allowance of such statutory exemptions from tax." In affirming our holding in People's Educational Camp Society, Inc., the Court of Appeals stated: This court has characterized the promotion of social welfare as involving the serving of "purposes beneficial to the community as a whole," or the promotion of the "welfare of mankind" in the manner generally of the charitable, educational and religious organizations exempted by like provisions of the Code. Debs Memorial Radio Fund, Inc. v. Commissioner, supra, 148 F. 2d at 951. * * * In Erie Endowment v. United States, 316 F. 2d 151, 156 (C.A. 3, 1963), the court stated that whatever difficulties were posed in defining "civic organization" the "organization must be a community movement designed to accomplish community ends." The primary argument of each party in this case is centered on the activities of petitioner in renting stall space to and boarding horses of persons other than its members and deriving income from horse shows put on by various organizations. Respondent, *113 relying to a large extent on People's Educational Camp Society, Inc. v. Commissioner, supra, takes the position that these operations were in substance the operation of a commercial stable and were such a substantial part of petitioner's activities that petitioner's operations were not exclusively for the promotion of social welfare. Petitioner argues that its boarding of horses and furnishing other services to members of the public and receiving funds from horse shows were related to its social welfare purposes and were for the purpose of producing funds necessary to defray the expenses of its "social welfare" objectives. Petitioner contends that since the income it received from activities with others than 1042 its members was used for carrying out its social welfare purposes, the fact that it engaged in such operation does not cause it not to be operated exclusively for the "promotion of social welfare." Petitioner in this argument relies on Debs Memorial Radio Fund, Inc. v. Commissioner, 148 F. 2d 948 (C.A. 2, 1945), reversing 3 T.C. 949 (1944). Petitioner states that the Debs Memorial Radio Fund case holds that where the "ultimate *114 destination" of the income from operations in the nature of commercial operations is the carrying out of the "social welfare purposes," for which the organization is operated, the operation is "exclusively for the promotion of social welfare" even though substantial income is received from the general public. Neither party discusses in detail whether petitioner's operations in supplying for a charge horses to be ridden by members of Posse 15 of the Los Angeles County Sheriff's Reserves, most of whom were also its own members, is properly to be designated as "social welfare." Petitioner's argument is based on the assumption that, except for income from persons other than its members, it would be an organization operated exclusively for social welfare. Respondent argues that petitioner has not carried out at all many of the purposes set forth in its charter on the basis of which respondent determined it to be an organization operated exclusively for social welfare and that during the years here in issue it was carrying out none of these functions. Petitioner's argument inherently assumes that Posse 15 and petitioner are substantially the same entity. The evidence shows that Posse *115 15 was a unit of the sheriff's office, responsible and reporting to the sheriff as any other reserve unit of the sheriff's office, but insofar as the evidence in this case shows, petitioner had no connection with the sheriff's office. The evidence shows that in order for an individual to join the mounted posse of the sheriff's office, he had to meet certain qualifications and be accepted by the sheriff as a member of the posse. Membership was apparently open to any qualified person in Los Angeles County. One of the requirements to be a member of the mounted posse was that the individual maintain at his own expense a horse, or have a horse available, for riding practice and other necessary riding. The sheriff's office did not prescribe where or how the horse was to be maintained and in no way was connected with petitioner's project of maintaining horses. The evidence shows that members of other posses of Los Angeles County maintained horses at home or at commercial stables and there is nothing in the evidence to indicate that members of other posses did not have their horses available by some rental arrangement at a regular commercial stable. In fact, a representative of the sheriff's *116 office who was a witness in this case was not at all sure of exactly what arrangement members of posses other than Posse 15 had with respect to keeping a horse available. Without ruling on the subject we will assume that if Posse 15 as an entity were asking an exemption from Federal income tax as an organization not operated for profit but operated "exclusively for the promotion of social welfare" it would be entitled to such exemption because of the fact that it served the whole county of Los Angeles, or the public in general, whenever called upon to do so. We will also assume that under respondent's rulings, were Posse 15 the entity which operated Peppertree Ranch, the fact that it received income from rental of horses and stable space to the public and the holding of horse shows on its property would not deprive it of its exemption if the funds so received were used solely for the social welfare operations which were its primary purpose. [3] In view of respondent's published rulings, it is difficult to understand why so much of respondent's argument in this case is devoted to pointing out the nature of petitioner's dealing with the public and so little of his argument is devoted *117 to whether petitioner's operations were for the "promotion of social welfare." [4] Even though respondent's rulings do not have 1043 the force and effect of law and are not binding on this Court, such rulings allowing an exemption to one organization in fairness should not be ignored in determining whether a comparable organization is exempt from Federal income tax. However, there exists a distinction in the facts on which respondent's revenue rulings are based and the facts in the instant case in that petitioner in this case was not directly engaged in any activity which can be properly classed as "promotion of social welfare." *118 Petitioner is an entirely separate entity from Posse 15. Petitioner's membership is open only to members of Posse 15 and not to the general public except to the extent that the general public is apparently eligible to join Posse 15. [5] Unless a person wanted to and met the qualifications to join Posse 15, he would not be eligible to join petitioner. [6] If petitioner were operated as a riding organization open to the general public on approximately a cost basis, it might be considered to be operated to promote the common good of the people of the community. [7] Petitioner, however, was not open to the general public on a cost basis but dealt on a profit basis with a limited segment of the general public. Therefore, petitioner cannot, on the basis of furnishing instructional or recreational facilities to the general public at cost, qualify as promoting social welfare within these rulings of respondent. Whatever contribution petitioner made to Posse 15 was by way of providing a convenient place for members of that posse to board their horses at approximately $5 a month less than the regular commercial charge for boarding horses and a place for members who did not own horses to have a *119 horse available to ride at a fee. Originally, the fee paid by Posse 15 to petitioner was approximately the commercial fee. In the years here in issue there were apparently on five or six members of Posse 15 riding petitioner's horses five times a month for the $130 fee. It would appear, therefore, that the fee paid by Posse 15 even in the years here in issue was generally comparable to petitioner's commercial riding fee. The members of Posse 15 who did not own horses paid a riding fee to Posse 15 to raise the funds with which Posse 15 paid petitioner the $130 a month. *120 Since the members of Posse 15 did certain work on petitioner's property without charge, petitioner may well be right in its argument that in substance the posse members paid approximately the same fee as other persons for boarding horses at Peppertree Ranch and riding horses there. Certainly, the small amount less, if any, paid by petitioner's members or members of Posse 15 is insignificant in considering the question of whether an organization that operates for a fee approximately the same as the general commercial rate a riding stable for 11 or 12 individuals who are members of a sheriff's posse and certain members of the general public, may be said to be operating for the promotion of social welfare. While the individuals who join the posse may make certain contributions to the social welfare of Los Angeles County, these individuals, though most of them are members of petitioner, are not petitioner. Petitioner is a corporate entity. Petitioner's argument is that in the years here in issue the primary purpose of its operations was for a fee to make stable space and horses available to 11 or 12 individuals, who themselves belong to an organization that is 1044 engaged in activities *121 for the promotion of the common good and general welfare of the people of Los Angeles County. Petitioner argues that its dealings with the public were for the purpose of providing the funds to operate Peppertree Ranch. It follows that petitioner's receipts from the public were for the benefit of its members, in that petitioner's members could have petitioner's facilities available at a lesser cost per member than would have been required if petitioner had not made its facilities available to the general public. In substance, petitioner financed its activities by funds raised from its operations with the public. Respondent in his revenue rulings has held that such a method of financing does not cause an organization operated primarily for the promotion of social welfare not to be exempt from income under section 501(c)(4). However, petitioner's dealings with the general public and its strict limitations on its membership are factors to be considered in determining whether petitioner was engaged in promotion of social welfare. The necessity of petitioner's increased offering of its facilities to the public to raise funds was undoubtedly to some extent occasioned by its membership limitations. *122 The clear inference from the record is that petitioner's members did not desire to extend membership to anyone other than a member of Posse 15. Under the definition of social welfare which this Court and other courts have accepted, for an organization to be engaged in the promotion of social welfare it must in some way render a benefit to the "community as a whole." Petitioner's direct purpose was not one of social welfare. The direct benefit of membership in petitioner was limited to the members of Posse 15. In the years here in issue Posse 15 had only 11 or 12 members. Without attempting to define what might constitute "the community as a whole" or "the people of the community" within the meaning of section 1.501(c)(4)-1, Income Tax Regs., [8] we do not consider an organization composed of 11 or 12 members in a city the size of Los Angeles to be a sufficiently large group to be referred to as a "community." Therefore, if petitioner's operation is to be considered one for the promotion of social welfare, it must be because it is a benefit to the members of Posse 15 who individually or as a group are a benefit to the community by being available and *123 ready to serve in community welfare work when called upon to do so by the sheriff of Los Angeles County. *124 Assuming that petitioner otherwise might be considered to be engaged in the promotion of social welfare, in our view the few persons eligible to use petitioner's facilities as members or on any basis other than by paying a regular commercial fee for such use causes petitioner's operation (no matter how laudible) to be such as not to come within the meaning of "social welfare." The operations of petitioner are more in the nature of those of a social organization of a limited number of persons interested in riding and horsemanship than of promotion of "social welfare." [9]
Since in our view the persons eligible for membership in petitioner and for whose benefit petitioner was operated were too limited in number during the years here in issue for petitioner's *125 operation to be considered for the promotion of social welfare, it follows that petitioner's operations are not "exclusively" or "primarily" for social welfare. If petitioner might be considered to be engaged to any extent in 1045 the promotion of social welfare, on this record we would conclude that petitioner's operations were not primarily for this purpose. The evidence shows that by the years here in issue approximately 70 percent of petitioner's gross receipts came from the general public and not from its members. It shows that by the years here in issue petitioner was operating its property very much as commercial stables operating in the general area were operating. Although its operations did not produce the large profit produced by the operations of the taxpayer in People's Educational Camp Society, Inc. v. Commissioner, supra, nevertheless the statement made with respect to that taxpayer's argument that it should be considered exempt since the income it derived from operations in the nature of commercial operations were used to carry out its social welfare purposes is also applicable in this case. In that case the Court of Appeals stated in this regard *126 as follows 331 F. 2d 923, 933]: The destination test ought not to be used to permit an entity to escape taxation where, as here, so much of its revenues are devoted to expanding its commercial facilities and increasing its surpluses, and so little of its revenues are actually spent for social welfare activities, that it is factually clear that the primary purpose of the organization is not really the promotion of social welfare but the running of a commercial operation. On the basis of the evidence in the instant case we conclude that by the years here in issue petitioner's primary purpose was the operation of a commercial stable. We recognize, as petitioner points out, that the provisions of section 511 with respect to the taxation of unrelated business income of organizations exempt from tax under subsections (3), (5), and (6) of section 501(c) do not include organizations exempt under section 501(c) (4). Respondent apparently recognizes this fact in his rulings. See, for example Rev. Rul. 66-221, 1966-2 C.B. 220, and Rev. Rul. 68-455, I.R. *127 B. 1968-34, 21. Also it is clear from the provisions of section 511 that the fact that an organization has unrelated business income does not cause that organization not to be exempt from Federal income tax if it comes clearly within one of the exemption provisions. The fact that section 511 does not provide for the taxation of unrelated business income of a social welfare organization is discussed in People's Educational Camp Society, Inc. v. Commissioner, supra, at 934. However, as held in People's Educational Camp Society, Inc. v. Commissioner, supra, this does not mean that where the primary purpose of an organization is carrying on a commercial operation that such an organization should be exempt under section 501(c) (4) even if there is some element of its operation which might be considered the promotion of social welfare. Respondent contends that petitioner was not operated exclusively for the promotion of social welfare because its members would be entitled to receive the property or the income from the sale thereof should petitioner be dissolved. Petitioner contends that under California law its members would not be entitled to receive petitioner's *128 property or the amount received from the sale of such property upon petitioner's dissolution. In this case we need not determine whether under California law petitioner's members would be entitled to the distribution of petitioner's assets upon petitioner's dissolution or whether, if they were entitled to such distribution, this fact would require a conclusion that petitioner was not exempt from Federal income tax under section 501(c) (4), since we have concluded for other reasons that petitioner is not entitled to exemption from Federal income tax under section 501(c) (4). Decision will be entered for respondent. Footnotes
1. All references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
1. Includes $2,024.96 "Gifts and Donations." Therefore, there was an operating loss. During the years 1944, 1946, and 1947, petitioner incurred obligations in connection with its acquisition of land and improvements in the total amount of $14,350. These liabilities were reduced by $6,177.44 from receipts from petitioner's regular operations between 1945 and 1962, and the remaining $7,222.56 was paid from proceeds of the sale in 1962. There were also certain costs in connection with the sale which reduced petitioner's net proceeds from the sale.
[2]↩ Total assets included proceeds from sale of land, listed as "Reserve for Replacement of Buildings and Improvements - $70,788.21" and not included in earned surplus.
3. See Rev. Rul. 66-221, 1966-2 C.B. 220 and Rev. Rul. 68-455, I.R.B. 1968-34, 21. See also and compare Rev. Rul. 68-45, I.R.B. 1968-5, 14, and Rev. Rul. 68-46↩, I.R.B. 1968-5, 15. 4. A substantial portion of respondent's argument is that petitioner's earnings "inured to the benefit" of its members. There is no provision in sec. 501(c)(4), I.R.C. 1954↩, exempting from income tax organizations operated "exclusively for the promotion of social welfare" that earnings of the organization may not "inure to the benefit" of the members. The cases cited by respondent in his argument of this point are cases involving organizations claiming exemptions as clubs organized and operated exclusively for pleasure or recreation "no part of the net earnings of which inures to the benefit of any private shareholder." Since we do not consider respondent's "inures to the benefit" argument to be relevant in this case except insofar as a purpose of benefiting petitioner's membership might be of such importance to petitioner as to cause the "primary" purpose for which it is operated not to be "social welfare," we will discuss respondent's contention that petitioner's earnings "inured to the benefit" of its members only as it relates to whether petitioner's dealings with the public were such as to cause its "primary" purpose not to be operating for the promotion of "social welfare."
5. In years after those involved in this case membership became open to former members of Posse 15. ↩
6. If an organization separate from Posse 15, as was petitioner, had engaged in raising money to contribute to Posse 15, that organization would not have been exempt from tax if its activities were primarily carrying on a trade or business for profit because of the provisions of sec. 502, I.R.C. 1954. Veterans Foundation v. United States, 281 F. 2d 912 (C.A. 10, 1960). We have found that by the years here in issue petitioner was operated substantially as were the commercial stables in its general location. Therefore, under the holding in Veterans Foundation v. United States, supra↩, petitioner would not be exempt from tax if its purpose were to furnish funds to Posse 15.
7. See Rev. Rul. 66-273, 1966-2 C.B. 222, exempting from Federal income tax an organization providing a community with facilities for rifle, pistol, and shotgun practice and instructions in the safe handling and proper care of weapons, and Rev. Rul. 67-109, 1967-1 C.B. 136↩, exempting an organization operated exclusively for the purpose of establishing and maintaining a roller skating rink as a recreational facility for the benefit and use of residents of a particular county where the rink was open to the general public upon payment of nominal dues and admission charges needed to defray operating expenses.
8. Sec. 1.501(c)(4)-1 Civic organizations and local associations of employees. (a) Civic organizations - (1) In general. A civic league or organization may be exempt as an organization described in section 501 (c)(4) if - (i) It is not organized or operated for profit; and (ii) It is operated exclusively for the promotion of social welfare. (2) Promotion of social welfare - (i) In general. An organization is operated exclusively for the promotion of social welfare if it is primarily engaged in promoting in some way the common good and general welfare of the people of the community. An organization embraced within this section is one which is operated primarily for the purpose of bringing about civic betterments and social improvements. * * * (ii) Political or social activities. * * * Nor is an organization operated primarily for the promotion of social welfare if its primary activity is operating a social club for the benefit, pleasure, or recreation of its members, or is carrying on a business with the general public in a manner similar to organizations which are operated for profit. See, however, section 501(c)(6)↩ and section 1.501(c)(6)-1, relating to business leagues and similar organizations. * * *
9. Petitioner in its petition in the alternative alleged that if it were not exempt under the provisions of Sec. 501(c)(4), I.R.C. 1954, it should be considered to be exempt under the provisions of other sections of Sec. 501(c) including Sec. 501(c)(7)↩ exempting an organization operated exclusively as a social club. At the trial petitioner specifically stated that it was abandoning these contentions.