The **DANFORTH FOUNDATION**, Plaintiff,

v.

**UNITED STATES of America**, Defendant.

No. 61 C 123(3).

United States District Court
E. D. Missouri, E. D.

June 27, 1963.

Fred L. Kuhlmann, Stolar, Kuhlmann, Heitmann & Eder, St. Louis, Mo., Wm. H. Charles, Bryan, Cave, McPheeters & McRoberts, Wm. D. Crampton, St. Louis, Mo., for plaintiff.

Richard D. FitzGibbon, Jr., U. S. Atty., John A. Newton, Asst. U. S. Atty., St. Louis, Mo., for defendant.

REGAN, District Judge.

Plaintiff brought this action to recover Federal income taxes claimed to be erroneously assessed and collected by the Commissioner for the years 1951 and 1952, with interest thereon and penalties.[1] This Court has jurisdiction under Title 28 U.S.C. § 1346.

The pleadings in this case presented three issues: (1) Whether the Foundations tax-exempt status was properly denied for the taxable years 1951 and 1952 under the provisions of Section 3814(1) of the Internal Revenue Code of 1939; (2) if so, is the Commissioner's determination of deductible expenditures correct; and (3) if exempt status was properly denied, is plaintiff subject to a penalty for failure to timely file returns for the years 1951 and 1952; Issue number (2) has been conceded by plaintiff and trial of issue (3) was reserved to a later date by pre-trial order. Issue (1) is the sole question now presented to the Court. The matter was tried to the Court and submitted on a partial stipulation of facts, transcript, exhibits and briefs.

The Danforth Foundation, hereinafter referred to as "the Foundation", was incorporated in 1927 by a pro forma decree of the Circuit Court of the City of St. Louis, Missouri, under the provisions of the Missouri law for chartering charitable organizations, Article XI, Chapter 90, Revised Statutes of Missouri, 1919. The purpose of the Foundation was originally set out as follows:

> "This Foundation is formed solely and only for charitable and humanitarian purposes and to promote the well-being of mankind throughout the United States."

In 1933, the article was amended to read as follows:

> "This Foundation is formed solely and only for purely charitable, educational and religious purposes and to promote the well-being of mankind throughout the United States."

The Articles of Agreement were amended in 1945 to make the existence of the Foundation perpetual.

The founders of the Foundation were William Danforth, president of Ralston Purina Company until 1936 and thereafter chairman of the board, and his wife, Adda Danforth. Mr. and Mrs. Danforth were the principal contributors to the assets of the Foundation throughout the period from its origin through the years here involved, the total value of their gifts being $4,864,657.00. The greater part of the assets of the Foundation after 1936 was comprised of common stock of the Ralston Purina Company, which stock was voted by proxy held during 1951 and 1952 by Donald

---

1. Plaintiff's claims for refund are as follows:

| Year | Tax | Section 291(a) Penalty | Interest |
|------|------|------------------------|----------|
| 1951 | $187,785.79 | $46,946.45 | $94,542.00 |
| 1952 | 134,952.31 | 33,738.08 | 59,844.88 |

Danforth who succeeded his father as president of the Company. Three family members, William and Donald Danforth and Dorothy Compton, daughter of the founders, were trustees of the Foundation during the taxable years involved in this case.

The Commissioner, by letter dated April 13, 1939, determined that the Foundation was tax exempt under the provisions of Section 101(6), Chapter 1, of the Internal Revenue Code of 1939, for the year 1939 and "subsequent years so long as there is no change in your organization, your purposes or your method of operation".

Section 3814, enacted effective September 23, 1950, provided for the denial of exemption under Section 101(6) in event of unreasonable accumulations of income. The statute was applicable to years beginning after December 31, 1950.

The Foundation filed for taxable years 1951 and 1952, as in other years, returns entitled "Return of Organization Exempt under Section 101(6)". By letter of July 21, 1958, the Commissioner ruled denying the Foundation's exemption for the years 1951 and 1952 because of accumulations of income held to be unreasonable within the meaning of Section 3814. Assessment pursuant to the proposed deficiencies in tax and penalties set out in a 30-day letter was consented to by the Foundation and the Foundation paid in full said assessment. The Foundation's claims for refund of the full amount paid together with interest were disallowed by the Commissioner.

The pertinent part of Section 3814 reads as follows:

"In the case of any organization described in section 101(6) to which section 3813 is applicable, if the amounts accumulated out of income during the taxable year or any prior taxable year and not actually paid out by the end of the taxable year—

"(1) are unreasonable in amount or duration in order to carry out the charitable, educational, or other purpose or function constituting the basis for such organization's exemption under section 101(6); * * * exemption under section 101(6) shall be denied for the taxable year. Sept. 1950 64 Stat. 957."

The regulations merely rearrange the order of the words of the statute. Treasury Regulations 111, Sec. 29.3814–1 and 118 Sec. 39.3814–1. The legislative history of the Section is but a little more enlightening. The Revenue Act of 1950 was directed in part toward eliminating abuses of exempt status under section 101(6). There was, prior to the enactment of the 1950 Act, frequent misuse of trust funds for the purpose of financing business interests of the grantor.[2] The House Bill provided not only against the application of funds to purposes other than the charitable purpose defined by the trust-forming instrument, but also provided for protection against potential abuse by requiring the expenditure of all current income within a short period after the close of the year. That provision was rejected by the Senate Committee as being too inflexible, thus, defeating the proper purpose of many exempt funds. Senate Report No. 2375, Aug. 22, 1950, U.S.Code and Cong.Serv. p. 3087. It was the joint conference which formulated Section 3814 as it was enacted.

The cases are more helpful in defining "unreasonable accumulations" in that they provide some standard by way of fact comparisons. The only case directly concerned with the construction of the wording of Section 3814(1) which has been reviewed by an appellate court is Erie Endowment v. United States (W.D. Pa.1961), 202 F.Supp. 580, affirmed March 28, 1963, (C.C.A.3) 316 F.2d 151, where the corresponding section of the 1954 Code was involved. In the Erie Endowment case, the clearly defined use for the major part of the current income was to accumulate $10,000,000.00, after which some worthwhile endeavor would be sup-

---

**2.** There is no suggestion in the pleadings or evidence that there was any misuse of Foundation funds.

ported. The appellate court stated, 316 F.2d page 155:

" * * * The standard to be applied is whether the taxpayer can justify the total accumulation of income at the end of the taxable year, in terms of both time and amount, on the basis of a rational total program of charitable intent. * * *

"Absent a justifiable total program of accumulation, however, tax exemption must be denied. The program must be prospective and not occur to the organization only after the Commissioner's shadow becomes visible. 'Afterthoughts will not suffice.' "

The Court quoted Stevens Bros. Foundation, Inc. v. C. I. R. (1962) 39 T.C. No. 11, where the tax court found that accumulations of income were unreasonable as to time and amount. In the Stevens case, as in Erie Endowment, the record was barren of any particular use to which either the current income or the accumulated income would be put. The petitioner in the Stevens case had embarked on a student loan program but no attempt was made to relate needs to the money goal.

Both of the above cited cases distinguish the facts involved from the facts of Samuel Friedland Foundation v. United States, (1956 N.J.) 144 F.Supp. 74, page 92, while quoting with approval the test suggested therein:

"Does the charitable organization have a concrete program for the accumulation of income which will be devoted to a charitable purpose and in the light of existing circumstances is the program a reasonable one?"

The Friedland Foundation's principle objective was charitable support for medical work and research and its particular primary objective during the years questioned was to provide for the construction of a medical research building at Brandeis University. The Court considered four broad factors: (1) the purpose of the accumulation and the dollar goal, (2) the funds available at the beginning of the period, (3) the likelihood of funds becoming available from contributions, and (4) the extent of time required to reach the goal. The Court concluded that the accumulation over the years of the $500,000.00 committed to the construction of the building, which could, under existing circumstances, reasonably be accomplished in six to eight years was not unreasonable.

In three of the other cases turning upon a comparison of the facts with the statute, the yard stick of the income accumulations was the cost of or indebtedness on property. In A. Shiffman v. C. I. R., 32 T.C. 1073, and in Tell Foundation v. Wood, 52 A.F.T.R. 1801, the income was used to pay off indebtedness on property which comprised assets of the foundations. In Hulman Foundation, Inc. v. United States, D.C., 217 F.Supp. 423, the primary objective was to construct and maintain a civic building. The foundation had explored costs and sites, and before the end of the questioned period had determined that more money was needed than was available. In each case the Court found in favor of the foundation.

In Truscott v. United States, 1 A.F. T.R.2d 1743, the Holloway Foundation sought to create a fund for retirement benefits of employees of an unrelated private company. Benefits payable at the time of the accumulation would amount to approximately $15.00 per employee per month and growth could not be anticipated to provide a substantial benefit for some years to come.

The distinctions between the facts of the instant case and the cited cases are more numerous than the similarities. In the two cases decided in favor of the Government, virtually no current program or purpose existed but to accumulate income for the sake of accumulation. On the other hand, the cases determined in favor of the foundations involved situations where the charitable program was specific and concrete. By the very nature of the programs, the money goal could be figured in rather specific dollar

amounts and the time to achieve the goal, barring wide fluctuations from existing circumstances, could be narrowly calculated. The facts presented here are not easily aligned with either.

The Danforth Foundation showed, from the beginning, constant but uneven growth. The annual income spurted from $5,391.78 for 1928 to $43,952.62 for 1936, and to $197,638.75 for 1939. By the end of 1939 the Foundation had assets valued at $2,457,268.74. From 1944 through 1952, the assets, income and expenditures were as follows:

| Year | Fair Market Value of Assets at Year's End | Gross Income less Capital Gain | Charitable Gifts, Grants and Expenses | Administrative Expenses | Accumulation of Income less Capital Gain |
|------|------|------|------|------|------|
| 1944 | $ 4,425,190.90 | $ 313,378.85 | $ 73,984.49 | $11,804.81 | $1,574,758.09 |
| 1945 | $ 7,444,197.79 | $ 307,574.19 | $ 94,152.98 | $10,465.28 | $1,777,714.02 |
| 1946 | $ 7,279,645.72 | $ 357,043.13 | $164,244.96* | $25,340.45 | $1,945,171.74 |
| 1947 | $ 8,963,954.23 | $ 531,135.91 | $ 80,467.53 | $20,325.85 | $2,375,514.27 |
| 1948 | $ 8,719,409.71 | $ 592,579.18 | $119,490.60 | $24,042.70 | $2,824,560.15 |
| 1949 | $15,779,885.62 | $ 819,321.95 | $118,204.06 | $21,933.02 | $3,503,745.02 |
| 1950 | $24,138,717.81 | $ 955,719.44 | $120,908.07 | $26,867.15 | $4,311,689.24 |
| 1951 | $34,503,807.33 | $1,290,241.45 | $128,284.84 | $56,965.63 | $5,416,680.22 |
| 1952 | $33,510,053.76 | $1,221,295.12 | $176,131.03 | $67,104.85 | $6,394,739.46 |

*Includes $125,000.00 pledged for construction of chapels over period from 1947–1956.

———◆———

The scope of the activities sponsored and supported by the Foundation widened through the years.[3] Two programs, the Camp Miniwanca Program and the Youth Development Program, were started in the thirties and were carried through all the years in evidence. The Camp Miniwanca Scholarship program was a leadership training program where a number of young people were sponsored to attend camp at which emphasis was placed on religious and spiritual values. The total scholarships for this program varied from year to year but in the years 1949, 1950 and 1951, totaled $20,375.18, $6,882.00 and $22,640.00, respectively. Through the Youth Development Program, the Foundation sought to distribute to potential leaders among young people the inspirational book entitled, "I Dare You". The expenditures for this program fluctuated widely,—from several thousand dollars to almost $20,000.00.

About 1941, when Dr. William Hutchins, retired president of Berea College,

3. Expenditures On Functioning Programs

| Program | Grants or Charitable Expenditures | | |
|---------|------|------|------|
| | 1950 | 1951 | 1952 |
| Camp Miniwanca | $ 6,882.00 | $22,640.00 | $20,424.20 |
| Youth Development | $ 8,235.11 | $10,685.56 | $11,421.78 |
| Danforth Associates | $48,413.45 | $39,151.74 | $51,785.61 |
| Danny Grads | $27,123.80 | $33,531.21 | $36,454.84 |
| Danforth Summer Seminars | | | $17,652.50 |
| Danforth Graduate Fellowships | | | $30,214.25 |
| West Liberty State College– Dept. of Religion | | $ 1,000.00 | $ 2,000.00 |
| Chapels | $15,000.00 | $14,370.28 | $11,151.64 |

came with the Foundation, additional programs were inaugurated which became regularly sponsored and supported programs of the Foundation. The first was the Danforth Associate Program whereby the Foundation provided selected college teachers, believed to hold high religious and spiritual values, with funds to aid in attaining informal contact with students outside the classroom. The grants of this program steadily increased through the years to $48,413.45 in 1950. The other program inaugurated by Dr. Hutchins became known by the title "Danny Grads". Selected women graduates were given leadership training and assigned for a year term to various college campuses to work with established religious organizations. The Danny Grads were given stipends from Foundation funds. Expenditures for this program increased to $27,123.80 in 1950.

Between the years 1947 and 1956, $125,000.00 was pledged toward the erection of college chapels. Approximately $56,000.00 of that amount was expended by the end of 1950.

In addition, throughout the years preceding the years involved in this case, the Foundation engaged in other charitable endeavors which did not become regular programs or which constituted a minor portion of its expenditures. These items included special study grants, prize awards and cancellations of college loans. The Foundation also undertook to support causes related to its purposes which were developed and operated by other exempt organizations, most often colleges or universities.

In about 1945 the trustees began looking for a full time director of the Foundation. Through Foundation activities, William Danforth had become acquainted with Dr. Kenneth Brown, then president of Denison College, and actively sought to engage him as director. Because of previous commitments to Denison, Dr. Brown delayed a decision until about 1949 when he accepted the formal offer of the trustees to come with the Foundation and assume directorship January 1, 1951.

Dr. Brown had, before his association with the Foundation, been keenly interested in fostering the influence of Christian thought in secondary school teaching. He immediately, in February, 1951, pursued this interest by offering for consideration of the trustees a plan whereby Danforth Associates would be given scholarships to attend a special summer session designed to better acquaint them with the Christian religion, philosophy of religion, and practical applications of ethics and religious thought to teacher-student relationships. The first such seminar was planned for the summer of 1952 at an anticipated cost of about $25,000.00.

Plans were also under way early in 1951 to establish the Danforth Fellowship Program for the purpose of aiding potential college teachers of high caliber to attain graduate degrees. In September, 1951, letters were sent out to 900 accredited colleges for appointment of liaison officers to aid in selecting applicants. During the winter applications were reviewed and approximately 140 applicants interviewed, and 40 or 50 persons selected.

Fellowships were granted on a proposed budget of $75,000.00 for the first year. Each fellowship was a commitment for continued grants for at least three years.

During the year 1951, the Foundation committed itself to provide one-half the salary, or $2,000.00, for a professor of religion at West Liberty College for a period of three years while the department was being established. A similar commitment was made at a number of other colleges in subsequent years.

In the early part of 1952, pursuant to recommendations of leaders of the American Association of Colleges for Teacher Education, a summer conference was called to explore needs of the teacher college in the field of emphasizing spiritual and religious values. Out of that conference a program was derived for experimental purposes. A number of schools were chosen to experiment in the

introduction, beginning in 1953, of emphasis on spiritual and religious values in some of the teaching courses. The plan anticipated annual cost of $30,000.00 for a five year period.

There were a number of other programs conceived by Dr. Brown or suggested to him which were briefly summarized in a memo to the trustees dated October 15, 1952, under the title "Possible New Activities". Some of these suggestions were in fact adopted in modified forms into Foundation programs in later years while others were discarded. There is no evidence that these additional programs were more than mere ideas during the years 1951 and 1952.

Based upon past expenditures and planned future expenditures revealed by the evidence, an objective sketch as of the end of the years 1951 and 1952 would be as follows:

| | 1951 | 1952 | Projected for 1953 |
|---|---|---|---|
| Accumulated Income At Years' Beginning | $4,311,689.24 | $5,416,680.22 | $6,394,739.46 |
| Current Gross Income (less Capital Gain) | $1,290,241.46 | $1,221,295.12 | $1,000,000.00** |
| Charitable Expenditures for Programs | $ 121,378.79 | $ 181,104.82 | $ 325,000.00*** |
| Estimate For Non-Program Expenditures | $ 30,000.00* | $ 30,000.00* | $ 50,000.00* |
| Administrative Expenditures | $ 56,965.63 | $ 67,104.85 | $ 70,000.00* |
| Excess of Income (less Capital Gains) Over Expenditures | $1,104,990.98 | $ 978,059.24 | $ 555,000.00 |

\* Estimated by rounding off previous high.
\*\* Estimate based upon downward trend.
\*\*\*Includes programs planned in 1952 to begin in 1953 or later and two year budget for Danforth Graduate Fellowship program.

---

Further projection would require the addition of costs for a third class of Graduate Fellows (originally budgeted at $75,000.00 per class per year) and recognize that virtually all of the programs have indicated a growing trend.

There can be no doubt that the trustees' decisions to accumulate income were made in good faith and in anticipation of early formulation of expansive programs which they believed would more than use the accumulated funds. In the spring of 1951, Donald Danforth and Dorothy Compton were so convinced of the Foundation's future monetary needs to carry out its plans in the years to come that they requested their father to change his will to leave their shares of his estate, which would have totaled $7,-249,440.00, to the Foundation. However, it is not the subjective beliefs and aspirations of the trustees which will define reasonableness under the statute.

The Foundation relies heavily, in justification of its accumulations, on the fact that it had been trying for about five years prior to the years subject to Section 3814 to engage Dr. Brown as its director, and knew that once a director of Dr. Brown's caliber was employed,

programs would eventually be developed that would use the funds. This argument is augmented by the fact that the years involved in this case were the first two years in which accumulations were restricted by the law. To allow these facts to qualify as justification would contradict the general intent and effect of the statute. It would allow continued accumulation wtihout any plans for charitable expenditure other than the general purpose stated in the trust-forming instrument as long as there was some activity directed toward reaching a program-planning stage of development. The distinction is too narrow between that activity and an accumulation, as in Erie Endowment, merely to acquire assets capable of producing sufficient income to carry out charitable objectives in the future.

The Government argues at length that the purpose of Section 101(6) exemption is to give relief to organizations which serve the public in a capacity which relieves the public treasury. Thus, where current income is not paid out during each year, the reason for the exemption is not being served. The Court, as did Congress, recognizes that foundations may serve to lighten the demands on the public treasury in less direct but equally worthwhile ways than is contemplated by the government's argument. The 8th Circuit Court of Appeals in Duffy v. Birmingham, 190 F.2d 738, as related here, distinguished organizations which are exempt under 101(6) from those not exempt by whether or not they served community interests or were primarily operated for the benefit of private parties. The Danforth Foundation, while it may not be a religious organization within the meaning of related statutes,' bears a resemblance to exempt religious organizations in its ultimate goals. Both are concerned with fostering ideas, philosophy and attitudes which are more or less universally believed to enrich individuals and, indirectly, the community. Because the Foundation's goals cannot be monetarily defined, and because its means must necessarily be through individuals effectively witnessing ethical, religious and spiritual values, it cannot be held to as strict a test of reasonableness in accumulation for programming as a foundation dedicated to acquiring or constructing a building.

Nevertheless, the evidence presented fails to show that the programs adopted will, as budgeted, begin to use expected annual income, let alone that accumulated before the questioned period. Furthermore, the record is absent any showing of attempt to relate the programs to anticipated income. Expenditures for programs designed by the end of 1951 could not be expected to exceed $300,000.00 in charitable grants, and under all programs designed by the end of 1952, expenditures could not be expected to exceed $500,000.00 in the immediate future. Further projection of probable charitable grants under programs of the Foundation would require speculation. Meanwhile, subsequent annual income could reasonably be anticipated to exceed $1,000,000.00. The conclusion that the unexpended income of $1,104,990.98 in 1951 and $978,059.24 in 1952, making a total accumulation of $6,394,739.46 by the end of 1952, constitute unreasonable accumulations is inescapable. Therefore, the Court finds in favor of the defendant on Counts I and II.

The Court adopts the foregoing as its findings of fact and conclusions of law. Entry of judgment will be delayed until trial of Counts V and VI, and further order of the Court.