It is hereby ordered that defendant's motion to dismiss be and is granted; and

It is further ordered that this action is dismissed.

**EDEN HALL FARM, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 71–1035.**

United States District Court, W. D. Pennsylvania.

Feb. 14, 1975.

John K. Barry, William J. Smith, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for plaintiff.

Donald Fish, Tax Div., U. S. Dept. of Justice, Washington, D. C., for defendant.

OPINION

SCALERA, District Judge.

I

Plaintiff, Eden Hall Farm, sued the government for the recovery of federal income taxes paid by it for the taxable years 1960 through 1967, inclusive, in the amount of $114,100.37 together with interest paid thereon in the amount of $30,230.61, plus statutory interest as provided by law.

Non-jury trial of the case was held. A stipulation of facts and a supplemental stipulation of facts, each with accompanying exhibits, were admitted in evidence at trial. Oral testimony was received. After trial, briefs were submitted.

II

Eden Hall Farm was incorporated under the Nonprofit Corporation Law of Pennsylvania on February 28, 1939, to carry out the purposes set forth in the will of Sebastian Mueller dated July 8, 1937, and admitted to probate on November 29, 1938. Mueller's will provided that the corporation maintain "a vacation home where working girls and women of proper character may go from time to time for the purpose of enjoying a vacation and obtaining rest and recreation." The regulations for admission adopted by the trustees of Eden Hall in 1939 provided that the facilities were to be available "to all working girls and women of proper character applying for admission" and further provided that "preference will be given to applicants residing in Allegheny County, Pennsylvania."

Management and control of Eden Hall was vested in a board of three trustees, all of whom were required to be employees of the H. J. Heinz Company during their term as trustees. Mueller, who was executive vice-president of the H. J. Heinz Company, had worked for the company in Pittsburgh since 1884. All trustees have been employees of the Heinz Company.

The land bequeathed to Eden Hall consisted of approximately 450 acres and included Mueller's summer home as well as 200 acres of land used for farming and orchards, and 250 acres of hilly woodlands. During each of the years in suit (1960 through 1967), there were guest facilities which included a lodge building with sleeping quarters for 38 guests, a dining room, sitting-TV room, administrative offices, a recreation room with bowling alleys and pool table, and a large building for indoor roller skating. Prior to 1966, sleeping quarters for two guests were included in Mueller's summer home. Because of fire regulations, these facilities were not used after 1965. The outdoor facilities included a swimming pool, tennis court, riding stable (where eight riding horses were kept), a bridle path, nature trails through the wooded areas, and a picnic grove.

Lodge expenses for the years in issue were as follows:

| | |
|---|---|
| 1960 | $ 98,694 |
| 1961 | 108,528 |
| 1962 | 99,970 |
| 1963 | 105,607 |
| 1964 | 121,378 |
| 1965 | 114,782 |
| 1966 | 126,842 |
| 1967 | 133,946 |

The farm at Eden Hall was operated to produce such products as fruit, meats and eggs for consumption by the guests. Small surpluses were sold and produced profits representing only a fraction of Eden Hall's total income. Farm expenses were as follows:

| | |
|---|---|
| 1960 | $61,443 |
| 1961 | 58,570 |
| 1962 | 75,011 |
| 1963 | 70,752 |
| 1964 | 73,731 |
| 1965 | 70,398 |
| 1966 | 81,896 |
| 1967 | 90,229 |

Based on the total of lodge and farm expenses, the cost per guest day for the eight-year period averaged $51.27. The yearly expenses figures were:

| | |
|---|---|
| 1960 | $48.44 |
| 1961 | 78.86 |
| 1962 | 50.72 |
| 1963 | 46.69 |
| 1964 | 54.00 |
| 1965 | 46.92 |
| 1966 | 56.55 |
| 1967 | 59.01 |

Those expenses listed as picnic grove expenses, which were insignificant in amount, have not been included in the computation of the average cost per guest day.

Eden Hall is open year-round except for a two-week period at Easter and a second two-week period at Christmas. Guests may use the facilities on any day

of the week. There has never been a charge. Alcoholic beverages are not permitted on the premises. Guests are not permitted to have a date at Eden Hall but can show a male guest around the place.

Prior to October, 1959, the women employees of the H. J. Heinz Company throughout the United States and Canada were invited to use Eden Hall. Retirees were included.

The women could use the facilities for weekends (normally from Friday at noon to Sunday evening), or for vacation purposes. In addition, if ambulatory, they could use Eden Hall to recuperate from illness and for convalescent purposes. Convalescent guests generally come for a week, sometimes two weeks, and occasionally three weeks. Once a woman made use of the facility, she could come back periodically. A weekender could come out to Eden Hall no more often than once a month, and a vacationer was limited to her normal vacation period, but in no event more than three weeks.

The first invitation extended to a group other than Heinz employees was in October, 1959, to the women who lived at the Athalia Daly Residence for Young Women in Pittsburgh. On February 6, 1960, an invitation was extended to the women teachers of the Pine-Richland Joint Schools (now Babcock School District). Originally, the invitation was limited to the use of the outdoor facilities of the farm on any weekday afternoon, the use of indoor recreation facilities and lounge rooms on Tuesdays and Thursdays between 6:30 p. m. and 10:30 p. m., and weekends. Eventually, however, the teachers were permitted full use of Eden Hall for vacation purposes.

On December 1, 1961, the trustees approved a policy whereby the women employees of the Heinz Company were permitted to bring a working woman guest with them to Eden Hall. These guests of guests were classified on the records as "outside guests." At first this was for a three-month period of the year

only; then, in 1963, from the first of the year through the month of May; then, in 1964, from September 19 to May 15 each year; and finally, in 1965; throughout the year.

On September 19, 1964, an invitation was extended to nurses employed at Allegheny General Hospital in Pittsburgh to use the facilities on weekends or for vacations. Through 1967 (this suit involves tax years 1960 through 1967), use of the facility was limited as outlined above.

On March 13, 1968, the privilege of bringing an outside guest was extended to the residents of the Athalia Daly Home. On March 18, 1969, the nurses of North Hills Passavant Hospital were invited to use Eden Hall. On August 1, 1972, an invitation to use Eden Hall was extended to the paramedical technicians in the laboratory, X-ray, EGG and EEG sections of North Hills Passavant Hospital.

### III

On September 1, 1939, the Bureau of Internal Revenue (now Internal Revenue Service) ruled that Eden Hall was exempt as a charitable organization described in Section 101(6) of the Internal Revenue Code of 1939, as amended. This was the predecessor provision to Section 501(c)(3) of the 1954 Code. Section 501(c)(3) provides, in pertinent part, that "corporations . . . organized and operated exclusively for . . . charitable . . . purposes . . . no part of the net earnings of which inures to the benefit of any private shareholder or individual" are exempt from taxation.

On June 24, 1969, the Internal Revenue Service advised Eden Hall that its tax-exempt status under Section 501(c)(3) was revoked effective December 31, 1959, and further that its application for exemption as a social welfare organization described in Section 501(c)(4) of the 1954 Code, for all years after 1959, was denied. Eden Hall accepted the determination of the Internal Revenue Service that it no longer

qualifies as a charitable organization within the meaning of Section 501(c)(3). This suit concerns the Internal Revenue Service's determination that Eden Hall does not qualify as a Section 501(c)(4) social welfare organization.

A second issue is whether, assuming that Eden Hall is not exempt under Section 501(c)(4) as a social welfare organization, the corporation is entitled to deduct certain expenses under Section 162(a) of the Code as ordinary and necessary expenses paid or incurred during the taxable years 1960 through 1967 in carrying on a trade or business. This section provides in pertinent part that in the case of a corporation the total deduction for charitable contributions for any given year "shall not exceed 5 percent of the taxpayer's taxable income." The Internal Revenue Service did allow deductions for real estate taxes, for expenses incurred in collecting income from investments, and for charitable contributions not in excess of the limitation described in Section 170(b)(2) of the Code.

Deficiencies in tax ($114,100.37), plus interest ($30,230.61), totaling $144,330.-98 for the years 1960 through 1967 were assessed by the government and subsequently paid by the corporation; claims for refund were filed; and this suit was instituted.

## IV

Section 501(c)(4), Internal Revenue Code of 1954, provides in pertinent part for the exemption from federal income tax of "civic leagues or organizations not organized for a profit but operated exclusively for the promotion of social welfare." [1] Further, Treasury Regulations on Income Tax (1954 Code), Section 1.501(c)(4)–1(a)(2) provides as follows:

(2) Promotion of social welfare— (i) *In general.* An organization is operated exclusively for the promotion of social welfare if it is primarily engaged in promoting in some way the common good and general welfare of the people of the community. An organization embraced within this section is one which is operated primarily for the purpose of bringing about civic betterments and social improvements.

The government argues that "the concept of social welfare suggests benefits affecting a whole community of people rather than a private group or groups," and further that "inherent in the definition of social welfare is the concept that only if persons generally within the community benefit will an activity promote the social welfare of that community." In support of its position, the government cites three cases: Erie Endowment v. United States, 316 F.2d 151 (C.A.3, 1963); Commissioner v. Lake Forest, Inc., 305 F.2d 814 (C.A.4, 1962), and People's Educational Camp Society, Inc. v. Commissioner, 331 F.2d 923 (C.A.2, 1964).

The court in *Erie,* supra, found that loans over $100,000 of the organization funds to the founder's daughter and to the founder's business and the requirement that contributions of the organization's funds had to be acknowledged by the erection of a plaque memorializing the founder and his bounty were among other factors indicating that the Erie Endowment had too many ties to its founder, E. H. Mack, to qualify for exemption as a civic organization under Section 501(c)(4).

In the *Lake Forest* case, supra, the court held that a non-profit corporation formed to acquire and operate a low-cost housing cooperative for its members was held not to be a civic league or social welfare organization because it did not offer a program or service to benefit the community-at-large.

---

1. Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes.

In the *People's Educational Camp Society* case, supra, the court upheld the rejection of the exemption claim of the society, which operated Tamiment in the Poconos, a large commercial resort in Pennsylvania, employing more than 400 persons and accommodating approximately 900 persons at charges ranging from $12 to $19 per day per person.

The government urges that Eden Hall does not come within the purview of the exemption because: (1) use of Eden Hall by "working girls and women" was by invitation of the trustees only and that these invitations were extended to a very limited number of groups; and (2) as a practical matter, actual use of the facility was predominantly by the women employees of the H. J. Heinz Company factories located in the United States and Canada.

V

Eden Hall Farm, of course, maintains that plaintiff's primary activities, that is, maintaining a vacation home for rest and recreation and providing convalescent care for working women recuperating from illness qualifies as "social welfare" under Section 501(c)(4).

In support of its position, Eden Hall refers to a number of rulings indicating that "activities making life better in the community are (c)(4) social welfare." For example, the Internal Revenue Service has ruled that a nonprofit corporation operated solely for the purpose of maintaining a roller skating rink as a recreational facility for residents of a particular county is exempt from tax under Section 501(c)(4), I.R.C.1954. Rev. Rul. 67–109, 1967–1 Cum.Bull. 137. In another case the Service held that an organization created to maintain an amateur baseball association composed solely of youths of college age is exempt from tax under the (c)(4) category. Rev.

Rul. 69–384, 1962–2 Cum.Bull. 122. In that ruling the Service stated:

"By helping to develop good sportsmanship, high character, and the physical and mental well-being of young adults through the operation of an amateur baseball league, it is held that the organization is promoting the common good and general welfare of the people of the community." [2]

In a similar ruling, the Service held that a nonprofit corporation organized and operated to stimulate the interest of boys and girls in the community 16-years-of-age and younger in organized sports is exempt from tax under Section 501(c)(4), I.R.C.1954 (Rev.Rul. 68–118, 1968–1 Cum.Bull. 261). In so holding, the Service stated as follows at page 262:

"By furnishing virtually free admission to youths and encouraging their attendance at sporting events, the organization is providing wholesome entertainment for the social improvement and welfare of the youths of the community. This promotes the common good and general welfare of the people of the community."

Other rulings cited by Eden Hall Farm are as follows: Revenue Ruling 66–273, 1966–2 Cum.Bull. 222, exempting a nonprofit organization which provides a community with facilities for rifle, pistol and gunshot practice, as well as instructions in the safe handling and proper care of weapons; Revenue Ruling 65–299, 1965–2 Cum.Bull. 165, exempting a nonprofit corporation counseling at nominal cost families and individuals of any income level about financial planning and payment of personal obligations; [3] Revenue Ruling 57–297, 1957–2 Cum.Bull. 307, exempting a nonprofit corporation finding employment for its members who are unemployed persons over a stated age and formerly

2. *Accord:* Rev.Rul. 70–4, 1970–1 Cum.Bull. 126 (organization promoted and regulated a sport for amateurs).

3. Contrast: Rev.Rul. 69–441, 1969–2 Cum. Bull. 115 (exempting under Section

501(c)(3), I.R.C.1954, a nonprofit corporation formed to reduce personal bankruptcy by aiding low income families and individuals with financial problems).

holding positions of administrative responsibility; Revenue Ruling 55–495, 1955–2 Cum.Bull. 259, exempting an association operating a loan fund for members and paying sickness, accident and death benefits to members who must be of a designated religious creed, of good character and health and also having the ability to earn a livelihood.

Still other rulings showing the nature of social welfare qualifying for exemptions from tax under Section 501(c)(4), I.R.C.1954, are as follows: Revenue Ruling 68–224, 1968–1 Cum.Bull. 262, exempting a nonprofit corporation formed to hold an annual festival centered around regional customs and traditions; Revenue Ruling 67–294, 1967–2 Cum. Bull. 193, exempting a nonprofit organization designed to encourage business relocation in a depressed area; Revenue Ruling 67–6, 1967–1 Cum.Bull. 135, exempting an association to preserve traditions, architecture and appearance of the community.

The plaintiff notes that in the published rulings, the coverage of those participating in the benefits of the exempt organization varied from the general public in a given community to more limited groups restricted in such a way so as to permit a reasonable utilization of the particular organization's resources and facilities, or restricted by reason of the organization's purpose. Yet, Eden Hall points out the purposes for which these organizations were organized served the community in some way. Similarly, the purposes for which Eden Hall Farm was organized have provided the basis for serving the Pittsburgh community by providing working women with opportunities for vacations, recreation and rest, and also convalescent care if deemed advisable.

## VI

The government makes essentially one point—that Eden Hall does not qualify as a (c)(4) social welfare organization providing a service to the community as a whole because the use of its facilities was by invitation only to a select and limited number of women predominantly employees of the Heinz Company.

As we have noted, none of the three cases which the government cites are similar to the facts of the case *sub judice*. This case does not involve, as did *Erie*, a charitable organization tied closely to its founder for an extended period of time whose apparent chief purpose was the promotion of the founder's name. This case does not involve, as did the *Lake Forest* case, the creation by a group of people of an organization for the benefit of the creating group of members. Nor does the case involve, as did the *People's Educational Camp Society* case, the operation of the largest resort business in the Pocono resort area. There were other facts in the three cases cited by the government distinguishing them from the Eden Hall Farm case.

It is apparent that initially Eden Hall Farm was conceived by Mueller as a recreation center for women employees of the Heinz Company. However, there is no evidence of domination, control or management by the Heinz Company. If the institution had been organized by the Heinz Company for the benefit of Heinz employees, this would be a different case. Nor does the fact that all of the trustees of Eden Hall Farm were employees of the Heinz Company indicate that the Heinz Company is involved in this case. Indeed, the government indicated that it was not pursuing the theory that Eden Hall Farm was an adjunct of the Heinz Company.

In the absence of any evidence that Eden Hall was operated directly or indirectly by the Heinz Company, it is apparent that the government's point that use of Eden Hall was "predominantly" by employees of the Heinz Company (assuming, of course, that such is the fact) is to suggest the proposition that predominant use of the facility by a group of employees of one company does not meet the standards of the statutory exemption. The government cites no authority for this position.

It is true that before October, 1959, and for a period of approximately twen-

ty years, the only invitation extended for use of the facilities was to the women employees of the Heinz Company. Thus, in 1959 and prior years, users of Eden Hall came chiefly from a group of 900 to 1,000 women employees of the Heinz Company plant on the Northside of Pittsburgh. This does not appear to be necessarily too small a group to qualify for the exemption considering the fact that Eden Hall was a facility which had 21 beds, later 40, subsequently reduced to 38.

Plaintiff's position is that taking into account preferences of the founder and because the arrangement afforded a practical way of allocating its 38 places, it seemed sensible to draw on the pool of 900 to 1,000 women employed in the Northside plant and later to invite other women employees of the Heinz Company. As the evidence indicates, this enabled Eden Hall to manage the allocation of its resources with a very small staff.

It should be noted that during the period 1958 and thereafter, local church and civic organizations used Eden Hall's picnic grove. The evidence indicates that many groups in the vicinity of Eden Hall Farm had this opportunity extended to them and that as many as 2,500 to 3,000 persons in any given summer did make use of the picnic grove.

In 1960, which was the first of the eight years in suit, in addition to the women employees of the Heinz Company, between 15 and 59 women residing at the Athalia Daly Home in Pittsburgh also had the opportunity to use the facilities of Eden Hall. Also, in 1960, 69 women teachers of the Pine-Richland (Babcock) School District began to use the facilities of the Farm two-days-a-week and on weekends. In 1964, the nurses employed at the Allegheny General Hospital began to use the facilities. This resulted in expanding the potential pool of women using Eden Hall by 216 in 1964, 353 in 1967, and 331 in 1971.

In late 1961, the potential pool of Eden Hall users was increased substantially by the trustees' "outside quest" policy, whereby women employees of H.

J. Heinz Company were permitted to bring a guest with them to Eden Hall. The evidence indicates that women employees from 79 firms came to Eden Hall Farm as "outside guests" on the invitation of Heinz employees. The number grew steadily, and by the end of 1971 women employees from over 700 firms had made use of Eden Hall Farm's facilities as "outside guests." In this number were those invited by Athalia Daly Home residents after the trustees extended the outside guest policy to that group on March 13, 1968.

For the period 1960 through 1967, based on the number of guest visits made each year, the women employees of the Heinz Company accounted for 79.4 percent of the visits, and all other guests 20.6 percent. Based on the number of days of occupancy by all guests each year, the Heinz employees accounted for 83.4 percent of the occupancy days, all others 16.6 percent. Further, for the same period, based on the number of guest visits per year, repeat guest visits accounted for 81.9 percent of all visits, and new visits only 18.1 percent. And finally, for the period 1962 through 1967 when the Heinz employees were allowed to bring "outside guests," those guests accounted for 12 percent of the guest visits, and 16.5 percent of the occupancy days.

Thus, in total numbers, relative to the places available, the limitations placed during the years on the sources and numbers of guests of Eden Hall appear in a different perspective and not nearly as restrictive as the government would make it appear. The pool of potential users of the facilities at Eden Hall numbered anywhere from 1,000 to several thousand, overlooking, of course, the fact that later each of the persons in the pool of potential guests could themselves bring a guest. The evidence indicates the wide range of companies from which the guests of guests came.

At no time once the invitation was extended has any group been given preference over another group regarding the use of Eden Hall Farm's facilities. The

procedure for arranging a guest visit has always been to accommodate women on a first-come, first-serve basis. When the facilities had been fully reserved, the directress placed a woman on a waiting list in the event of a possible cancellation. Once a cancellation occurred, any woman on this list also received consideration on a first-come, first-serve basis.

The occupancy of Eden Hall Farm's facilities has ranged from 22.5 percent of the total bed-days available for use in 1960 to a high of 29.7 percent in 1967. Because of seasonal changes and winter climate conditions which exist in Western Pennsylvania, possibly a more representative measure of occupancy by guests is the percentage of the days when the facilities were available for use during the months of May through October. In that time frame, the use of Eden Hall's facilities increased showing generally a percentile occupancy rate approaching and reaching the mid-thirties during the years in suit, thereafter rising to a percentile occupancy rate in the low and middle forties in 1969 and 1971.

Guest occupancy rates are more meaningful when measured against an appropriate yardstick. Lacking direct comparables, the parties stipulated to the presentation of statistics on occupancy rates for resort hotels located in the northeastern area of the United States, including Pennsylvania, and in the Pocono-Atlantic City area in New Jersey and Eastern Pennsylvania. The statistics are, from annual studies made by Harris, Kerr, Forster & Company, a certified public accounting firm that annually prepares and publishes a study presenting economic data about the hotel-motel industry, including resort hotels in the United States, Hawaii, and Puerto Rico.

For 1960 through 1967, based on the number of bed-days available for use, the occupancy rate at Eden Hall was 27.-1 percent; and for the period May through October of each year, the rate was 33.2 percent. These statistics are to be compared with the occupancy rates reflected in the Harris, Kerr, Forster Survey for the northeastern area, where the occupancy rate was 49.9 percent, and the Pocono-Atlantic City area, where the rate was 46.4 percent.

The government emphasizes the differences between the average occupancy rate at Eden Hall and the average occupancy rates reflected in the Harris, Kerr, Forster Survey, and notes that compared to the occupancy rate at Eden Hall of 27.1 percent, the average rate for the northeast area was 84 percent higher, and for the Atlantic City-Pocono area 71 percent higher for the comparable period.

Plaintiff points out that any analysis of the differences in occupancy rate must consider the fact that the Harris, Kerr, Forster Survey considers not only summer guests but guests interested in winter activities, and also notes that the percentage of occupancy in the Harris, Kerr, Forster Survey ranges, for example, in the year 1960 from a low of 34.9 percent to a high of 66.2 percent among sixteen hotels in the northeastern area.

The plaintiff reproduces in its brief the table from exhibit 69 in evidence, which outlines the differences in occupancy rates. For example, in 1967, when the occupancy rate of Eden Hall Farm was 29.7 percent, the low occupancy rate according to the Harris, Kerr, Forster Survey of nineteen hotels in the northeastern area was 33.4 percent, not much more than the 29.7 percent occupancy rate of Eden Hall Farm. The low occupancy rate for the northeastern area in the Harris, Kerr, Forster Survey was 34.9 percent in 1960, 31.2 percent in 1961, 33.6 percent in 1962, 29.3 percent in 1963, 31.8 percent in 1964, 38.3 percent in 1965, and 37.9 percent in 1966.

Considering the varying percentages indicated by the evidence, it must be concluded that the percentage of occupancy rate in the resort areas in evidence does not differ much from that of Eden Hall Farm. Thus, if the government intended to suggest by its analysis that the limitations placed on the sources of the guests of Eden Hall re-

sulted in an unduly limited use in numbers of the facilities, this conclusion is not warranted by the evidence.

We are unable to conclude that because the employees of the Heinz Company accounted for approximately 80 percent of the guest visits for the years in suit, 1960 through 1967, Eden Hall Farm necessarily does not meet the statutory requirements of Section 501(c)(4). We note that the women employees of the Heinz's Pittsburgh installation amounted to approximately 1,000 women. We further note that the balance of guest visits or the remaining 20 percent of guest visits included the employees of over 700 other companies.

No authority has been presented to support the proposition that these proportions necessarily put Eden Hall outside the limits of the statutory exemption. Nor, indeed, do we find that the fact that Eden Hall was utilized by invited groups necessarily means that it cannot qualify as an institution whose purposes benefit the community as a whole. It is apparent from the evidence that the invitational process was used as a mechanism or device to extend the use of the facilities to groups who were screened in the first instance by virtue of employment, and, secondly, apparently employment at specific neighboring companies and institutions whose employment practices were known to the trustees and whose employment practices met with the approval of the trustees. In the absence of any evidence to indicate that this technique was utilized to discriminate or accomplish some other improper or illegal purpose, the invitational device does not appear to disqualify Eden Hall Farm from the statutory exemption.

The government seems to suggest in its argument that because the trustees did not advertise that all working women were invited, Eden Hall would not qualify. This is not the law. Nor is it required that Eden Hall Farm should have invited the women employees of all companies in the immediate community. The government cites no authority in this regard. The government merely notes that whatever the outside limitations for qualification as a social welfare organization serving broad community needs are, it is obvious that Eden Hall did not meet the statutory requirements. This is not obvious when one reviews the wide range of organizations which have qualified for the statutory exemption.

Considering all of the evidence, Eden Hall Farm is an institution which has served a broad community need in the sense that Congress intended, that is, that when one segment or slice of the community, in this case thousands of working women of the Pittsburgh and Allegheny County area, are served, then the community as a whole benefits. It appears that the trustees were unnecessarily cautious in extending their invitation, especially in view of the evidence that the Farm was not filled to capacity usually. However, the evidence indicates that the origins of this cautious approach may be found first in the desire of the founder to favor the women of the Heinz Company. Thus, in exhibit 22, Mueller instructed the trustees that if the Heinz Company cannot "fill up the place . . . you are authorized to select from another factory or store, or whatever the case may be a sufficient number of girls to enjoy a country holiday."

Trustee Herr testified that care was taken not to displace a Heinz employee. Secondly, the trustees were aware of the admonition of Mueller that if employees from other than the Heinz Company are invited, "you should have a guarantee from the employer that those to be invited are of good moral character and good habits."

It is therefore not accurate to say, as the government does, that there was no reason for the invitational policy. The reasons are in evidence and are rooted in the desire and instructions of Mueller. In addition, of course, as the testimony indicates, operating as they did by inviting employees and residents of

neighboring firms and institutions, the Farm could manage with a small staff.

We find that Eden Hall Farm is a non-profit institution serving the Pittsburgh and surrounding community by providing a "country holiday" to thousands of working women and qualifies for the statutory exemption. We conclude that plaintiff is entitled to recover the tax paid for the tax years involved in this case. Having determined this, we understand it to be unnecessary to determine the second issue in this case, that is, whether the corporation was entitled to deduct certain expenses under Section 162(a) of the Code as ordinary and necessary expenses paid or incurred during the tax years 1960 through 1967 in carrying on a trade or business.

This opinion shall be deemed to constitute the court's findings of fact and conclusions of law. The parties are directed to calculate the amount to be recovered by plaintiff and to submit a proposed judgment in accordance with this opinion.